[Crim. No. 489.  In Bank.—June 17, 1899.]

THE PEOPLE, Respondent, v. FRANK D. CRANDALL, Appellant.

<div style="float:right">

| | |
|---|---|
| 125 | 129 |
| 127 | 506 |
| 125 | 129 |
| f130 | 647 |
| 125 | 129 |
| 132 | 17 |
| 125 | 129 |
| 144 | 63 |
| 125 | 129 |
| f148 | 204 |

</div>

CRIMINAL LAW—HOMICIDE—EVIDENCE—MARKED PHOTOGRAPHS—DISCRETION.—Upon the trial of a defendant accused of murder, the use in evidence of photographs of the scene of the homicide, taken by the prosecuting officers, with certain places marked thereon as pointed out by witnesses, is within the discretion of the court.

ID.—PHOTOGRAPHS AS DIAGRAMS—HEARSAY—PROOF OF CORRECTNESS.—Like any other diagrams, the value of the photographs must be determined by the jury from all the evidence; and they are not inadmissible hearsay merely because the places marked were pointed out by witnesses, if they testify that they were correctly pointed out, and the correctness of the marking is proved.

ID.—PHOTOGRAPHS TAKEN BY PROSECUTION—UNSEEMLY TESTIMONY.—Although it may not be erroneous to permit the use as diagrams of photographs taken by the prosecuting officers, yet, their office being quasi judicial, it would be better if the proof were furnished by other witnesses. It is unseemly that the same person should be both advocate and witness.

CXXV. CAL.—9

ID.—IMPROPER IMPEACHMENT—CROSS-EXAMINATION AS TO IMMORAL
CONDUCT.—Questions asked upon cross-examination of the wife
of the defendant, for the avowed purpose of impeachment, as to
whether she did not live by prostitution, and as to particular
times and places, and particular men, and special modes of soli-
citation for immoral purposes, are highly improper; and the
asking of them is prejudicial error as insinuating damaging
charges against the witness tending to disgrace and degrade
·her.

ID.—COLLATERAL INQUIRY—ANSWERS CONCLUSIVE—ARGUMENT OF
DISTRICT ATTORNEY.—The inquiry as to the grossly immoral
conduct of the defendant's wife, being wholly collateral to the
issues, and the insinuated charges being such that they could
not be rebutted otherwise than by the denial of the witness, her
denials in answer to the improper questions are conclusive, and
the prosecution could not contradict them; nor could the dis-
trict attorney properly insinuate in argument to the jury that
her answers to the questions were not true.

APPEAL from a judgment of the Superior Court of Los An-
geles County and from an order denying a new trial.  B. N.
Smith, Judge.

The facts are stated in the opinion of the court.

W. H. Shinn, and Earl Rogers, for Appellant.

W. F. Fitzgerald, Attorney General, for Respondent.

VAN DYKE, J.—The defendant was tried upon a charge
of murder and convicted of manslaughter.  He appeals from
the judgment and from an order refusing a new trial.

The homicide was committed at Ballona, on a lagoon near the
beach, between Santa Monica and Redondo, in the county of
Los Angeles.  The only defense urged was that the life of the
deceased was taken by the defendant in necessary self-defense.

Some two weeks prior to the homicide defendant rented from
Hoagland a cabin having but one room, not far from the ocean
beach and near the cottage occupied by Hoagland and his part-
ner, who were fishermen.  Soon after William White and Bow-
man—the deceased—joined Crandall at his request, and occu-
pied the cabin with him.  On the Sunday preceding the homicide
they were joined by Mrs. Crandall, Mrs. Bowman, wife of
deceased, and Maud Nelson, the mistress of White.  The parties
spent Sunday night at the cabin drinking.  During the night

a quarrel arose between Maud Nelson and Mrs. Crandall, into
which Bowman and defendant were drawn. According to the
testimony of the defendant and his wife, Maud Nelson asserted
that defendant had made improper proposals to Mrs. Bowman,
and, although Mrs. Bowman promptly denied the accusation,
Bowman made some direful threats against defendant, and, as
White sided with Bowman, defendant, who was an invalid, be-
came alarmed and left the cabin at about 2 o'clock in the morn-
ing; he and his wife went to Hoagland's cottage, where they
spent the balance of the night. There they were told of other
threats made by Bowman against the defendant. In the morn-
ing they rode with Hoagland on his fish wagon to Los Angeles,
being afraid, as they testified, to remain at the beach. Never-
theless, defendant arranged to return and stop at the cottage
with Hoagland, and took along some implements for baking
clams, and also took with him a revolver. And on the following
Tuesday he procured a buggy from a livery stable and returned
to the beach with one Bremmerman. Then, having put up his
horse, he and Bremmerman proceeded to the cabin to get some
goods which Crandall had left. While collecting his things he
inquired of White and Maud Nelson for Bowman, and was told
where he was. Bowman was at the time lying down upon the
sand, some three or four hundred yards distant, and Crandall
and Bremmerman then proceeded toward him. Bowman, hav-
ing seen them coming, got up and met them. When they met,
Crandall asked Bowman for a pair of suspenders which he had
loaned him. Bowman took them off and handed them to Cran-
dall, and thanked him for their use. All three then turned and
walked together toward the cabin. Bowman soon began to com-
plain that Crandall had refused to be security for him for a
small bill at Los Angeles, and charged him also with having
insulted his wife. When Crandall denied this last charge Bow-
man suddenly turned upon him, put both hands upon his shoul-
ders, and "glowering down at him," said: "You lie, you God
damned son of a bitch. I will fix you." Crandall then asked
Bowman to let him alone, and jerked away from his grasp, drew
his pistol and shot him. Bremmerman was a witness for the
prosecution and was the only person, other than the parties, who
saw the affray, although there were several within hearing.

There was a difference as to the number of shots. Defendant testified, and in this he was corroborated by Bremmerman, that two shots were fired as rapidly as could be from a self-cocking pistol. Defendant claimed that both shots were fired while Bowman was standing over him; and Bremmerman testified that they were not more than two or three steps apart when the last shot was fired.

Other witnesses testified to four shots, and that defendant had admitted that he had fired four. Bowman turned to run as soon as possible after the firing commenced, and the prosecution contended that the fatal shot was fired while deceased was retreating, and while defendant stood upon a ridge of sand and deceased was running down. The prosecution's theory was that the bullet entered at the back of the neck and passed downward toward the front, cutting the subclavical artery. The contention on the part of the defense was that the fatal bullet was fired from a point below, and before Bowman turned around to retreat; that it entered the breast near the armpit, and passed back and upward, coming out at the back of the neck.

The prosecution seemed to have had two theories: one that Crandall bought the pistol and went to the beach to assassinate Bowman, and the other that, even if the first shot was justifiable, the fatal shot was fired after Bowman had, to the knowledge of the defendant, declined further controversy, and was retreating. Considering the verdict, the latter was probably the theory adopted by the jury, although it may have been a compromise verdict.

Defendant testified that he did not stand upon this ridge when he fired at the deceased, but that Bowman stood above and facing him, and, after the shots, passed over the ridge, falling about one hundred feet away from him. To these questions the evidence was mainly addressed.

There had been a previous trial, and, to make things plain, the two deputy district attorneys who prosecuted the case took a camera to the beach and had Bremmerman and Jacobs point out the localities to them, and took some photographs, which were introduced in evidence at the trial as diagrams. They marked upon the photographs where other witnesses said the dead body of Bowman was lying, and where such witnesses said

defendant told them he stood when he shot Bowman. Such witnesses were sworn, and testified that they correctly pointed out such spots to said deputies, and the latter testified that the localities were correctly marked according to the information given to them, but the diagrams were not verified by the other witnesses. These deputy district attorneys also testified as to what could be seen from the window in a cabin, to support the testimony of White, whose veracity had been attacked by other evidence to the effect that the scene of the conflict could not be seen from the window.

The defendant strenuously contends that the admission of the photographs and the testimony of the prosecuting officers was erroneous, chiefly on the ground that the evidence was hearsay, was manufactured by the prosecuting officers, and, as claimed by defendant, was a gross abuse of their semi-judicial positions, to the prejudice of the defendant.

The photographs were used only as diagrams, and, although more complete proofs of their correctness could well have been required, still it cannot be said the trial court abused its discretion in allowing them to be used. We may assume that every one now understands the limitations upon the use of the photograph. It presents but one point of view, and may sometimes make an unfair representation of the points at issue. Like any other diagram, its value must be determined by the jury, from all the evidence. The evidence was no more hearsay than any evidence of a surveyor who makes a diagram to illustrate some theory of a case. Its value depends upon other evidence.

The evidence was, in a sense, manufactured by the prosecution, but not in an offensive sense. Tests are sometimes made and proven to settle certain disputed possibilities. We are not prepared to say it was error to allow them to be made by the prosecuting officers, although, as a rule, since their office is *quasi* judicial, it would have been better had the proof been furnished by other witnesses. That the same person should be both advocate and witness is unseemly, and shocks our sense of propriety.

There is no application of the recent decision in *People v. Hill*, 123 Cal. 571, to this case.

The defendant's wife was called as a witness and gave import-

ant evidence in his behalf. On cross-examination, for the avowed purpose of impeaching her, the district attorney, against continuous objection and protest on the part of the defendant, was allowed to ask a series of questions which, if answered affirmatively, would disgrace and degrade the witness. They were all wholly collateral and outside the issues in the case, and did not refer to the relation of the witness to the parties, to the subject of the action or to the previous testimony of the witness. The asking of the questions implied, at least, an assertion of a belief on the part of the attorney that the witness had been guilty of gross immorality. It is charged by the defense that the questions were not asked for the purpose of getting before the jury the testimony of the witness upon the subject of investigation, but to insinuate damaging charges against the witness, which, by the rules of evidence, neither the witness nor the party could rebut, save by the denials of the witness, whose credibility was affected by the insinuations. That this charge was well founded is proven beyond cavil by the record. She was asked by a great variety of questions if she did not live by prostitution. She was questioned in reference to particular times and places, and to particular men, and as to whether she did not practice special modes of solicitation for immoral purposes. To all these questions the witness answered in the negative.

The defendant's contention, that by the decisions in this state this line of cross-examination is not allowable, is correct.

Section 2051 of the Code of Civil Procedure says: "A witness may be impeached, by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth, honesty or integrity is bad, but not by evidence of particular wrongful acts, except that it may be shown by the examination of the witness, or the record of the judgment, that he had been convicted of a felony."

In other states there is apparently a conflict of decisions upon the subject. (See *Carroll v. State*, 32 Tex. Crim. App. 431, 40 Am. St. Rep. 786, where the matter is discussed, and the cases cited.)

But while there is a controversy as to whether such questions can be permitted, there is no difference in holding that when allowed the answer of the witness must be accepted as conclusive.

In asking such questions the questioner takes that risk, and justly so, because under the rules of evidence no other witness can be allowed to testify upon the subject. Neither the witness whose character is assailed, nor the party the value of whose evidence is sought to be discredited, can sustain the witness on those points by other witnesses. The only evidence, therefore, which is allowed must be conclusive, and should be taken in good faith as true. This court has held in a number of cases that the answer of the witness to this class of questions must be taken as final and conclusive, and its truthfulness beyond all attack by independent evidence, and it has further been repeatedly held that such collateral matters cannot be gone into, even upon cross-examination. Section 2051 of the Code of Civil Procedure expressly forbids the impeachment of a witness "by evidence of particular wrongful acts." (*People v. Hamblin,* 68 Cal. 101; *People v. O'Brien,* 96 Cal. 180; *People v. Un Dong,* 106 Cal. 88; *People v. Wells,* 100 Cal. 462; *People v. Silva,* 121 Cal. 668; *Pyle v. Piercy,* 122 Cal. 383; *People v. Sharon,* 79 Cal. 673; *Estate of James,* 124 Cal. 653.) In *People v. Un Dong, supra,* the court say: "This whole course of examination by the prosecution was improper in the highest degree. The questions asked were not only in large part violative of defendant's rights to have his cross-examination confined to the subject matter of his testimony in chief (referring to former cases), but the obvious purpose and undoubted effect of such course of examination was to degrade the witness and prejudice the defendant in the estimation of the jury. Its allowance was, therefore, erroneous and clearly prejudicial. Nor was the error cured or the prejudicial effect removed by the negative answers to the questions allowed, or the sustaining of defendant's objection to others, where, as here, the manifest purpose and inevitable tendency of the questions was to injuriously affect the verdict. The error in such case lies in permitting an examination of that character. (*People v. Wells, supra.*)

In the case under consideration, after the prosecuting officers had gone out of their way in putting such questions, which were negatively answered, and which answers under all rules are made conclusive of the facts, they proceeded in their argument to insinuate to the jury that the answers were not true. This demon-

strated conclusively that the purpose of asking the improper questions was to make insinuations against the character of the witness, and not to impeach her testimony, and by this improper mode of procedure to prejudice the defendant. The attorney general argues that other testimony in the case tended to show that the witness belonged to a degraded class. If so, the district attorney should have relied upon such evidence, and should not, as he did, have voluntarily rebutted this theory by the answers of defendant's witness to his improper questions.

Judgment and order reversed and cause remanded for a new trial.

Garoutte, J., McFarland, J., and Harrison, J., concurred.

TEMPLE, J., concurring.—I concur in the judgment and in the opinion of Mr. Justice Van Dyke, except that I do not agree that questions irrelevant to the issues in a case, asked for the purpose of discrediting the witness, can never, in the discretion of the trial judge, be asked of a witness. It is said that sections 2051 and 2052 of the Code of Civil Procedure prohibit such evidence. In express terms these sections certainly do not. It is stated that a witness may be impeached: 1. By contradictory evidence; 2. By evidence that his general reputation for honesty and integrity is bad; and 3. By proving inconsistent statements.

Other modes of impeachment are not expressly prohibited, and ever since the existence of the statute other modes have been freely resorted to. Witnesses are constantly cross-examined as to their bias, or their interest in the case, their relationship to the parties, and also as to their occupation and position in the community; also as to what persons they have conversed with about the case; whether they have been paid to attend court, et cetera. These are all matters of impeachment, and none of them fall within the modes specified in the statute. The statute has, in fact, never been treated as prohibiting other usual modes of impeachment, and if it was intended that a witness could not be impeached except in the specified modes, there would have been no occasion for the one special negative "but not by evidence of particular wrongful acts."

As a general rule, the cross-examination should be confined to the subject matter of the direct examination, but this rule

necessarily cannot apply to matters of impeachment. We all
agree that a witness cannot be asked questions merely for the
purpose of degrading him, and while there has been much con-
troversy as to admissibility of such evidence, no one contends
that a party has an absolute right to indulge in such examina-
tion. It is not permissible to go into the former life of a wit-
ness and unnecessarily drag to light ancient scandals. The mat-
ter is almost entirely within the discretion of the trial court, and
such examination should be permitted only when and so far as it
seems to be required for the ends of justice.

It is said that the earlier rulings were against allowing a cross-
examination for the purpose of testing the character of the wit-
ness, and yet I find in a work as early as Roscoe's Criminal Evi-
dence the following: "A witness may be questioned in cross-ex-
amination not only on the subject of inquiry, but upon any other
subject, however remote, for the purpose of testing his character
for credibility, his memory, or his accuracy. . . . . The moment
it appears that a question is being put which does not either bear
upon the issue or enable the jury to judge of the value of the wit-
ness' testimony, it is the duty of the court to interfere as well
to protect the witness from what becomes an injustice or an in-
sult as to prevent the time of the court from being wasted."

Greenleaf states the rule pretty much in the same way. (1
Greenleaf on Evidence, sec. 459.) The question discussed by
him, and which he says "has not yet been brought into direct
solemn judgment," is, whether the witness is privileged and may
decline to answer. He expressly states that the question may
be asked, and sees no good reason for allowing a privilege to the
witness.

Rice in his work on Evidence considers the question quite
elaborately. He states the rule to be that: "Such questions
should be allowed when there is reason to believe it may tend to
promote the ends of justice; but they may be properly excluded
when a disparaging course of examination seems unjust to the
witness or uncalled for by the circumstances of the particular
case." He cites the case of *Great Western etc. Co. v. Loomis*, 32
N. Y. 127, 88 Am. Dec. 311, where the discretion of the trial
court is asserted, and in which are cited three cases tried by Lord
Ellenborough, in one of which, when a witness was asked if he

had not been tried for theft, the court ordered the witness to answer and told him he would be sent to jail if he did not. In another he told the witness he could answer or not, as he pleased, but said if he were asked such a question he would refuse to answer. In the third the judge stopped the examination and would not permit the question to be answered, although no objection was made by anyone.

The author makes it plain that there has been no such discrepancy in the English cases as has been supposed. They are nearly all cases at *nisi prius*, and whichever way the court held it was within the rule which lodges the discretion in the trial judge. In the nature of the case no fixed rule for the exercise of the discretion can be laid down. In *White v. McLean*, 47 How. Pr. 193, is a full discussion of this subject, as also in *Carroll v. State*, 32 Tex. Crim. App. 431, 40 Am. St. Rep. 786, cited in the principal opinion.

In 1 Thompson on Trials, section 458, it is said that the better rule is that the trial court may allow, limit, or refuse such examination, and its ruling is not subject to review except in cases of manifest abuse (See, also, Taylor on Evidence, sec. 1314, *et seq.*)

In Stephens' Digest of the Law of Evidence it is said: "Where a witness is cross-examined he may be asked any question which tends: 1. To test his accuracy, veracity or credibility; or 2. To shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant to the fact in issue, and however disgraceful to himself, except where the answer might expose him to a criminal charge"—and under our statute, it may be added, where it tends to prove particular wrongful acts. In fact, except in this state, the rule is quite uniform that in the discretion of the trial court such questions may be asked.

Nor do I admit that a different rule has been established here. Most of the cases cited have no bearing upon the general proposition. Of course, such examination is not allowable in every case. Where it is manifest, as in *People v. Wells*, 100 Cal. 462, and in *People v. Un Dong*, 106 Cal. 88, that the examination was not for the purpose of proving the immorality, but to prejudice

by insulting questions, it should not be tolerated and it would be error to permit it.

In *Pyle v. Piercy*, 122 Cal. 383, an attempt was made to prove upon cross-examination of a married woman that she had been too intimate with her husband before their marriage. The purpose of this examination may well have been held to be to insult the witness. This court simply said: "A witness cannot be impeached in this way." Upon the authorities, and upon principle I think, the trial judge may permit such examination when he deems that the ends of justice would be promoted by so doing; but, if he refuses, his discretion will rarely be interfered with.

Henshaw, J., and Beatty, C. J., concurred.