[Crim. No. 991. Third Appellate District.—November 16, 1927.]

THE PEOPLE, Respondent, v. FRANK LOOMIS, Appellant.

Foltz, Rendon & Wallace for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and G. C. Darrah, District Attorney, for Respondent.

PLUMMER, J.—The appellant was convicted of manslaughter upon an indictment charging him with the crime of murder in that he did, on or about the fourteenth day of April, 1927, in the county of San Joaquin, wilfully, unlawfully, feloniously, and of his malice aforethought, kill and murder one E. J. Wilson. This appeal is prosecuted by the appellant from the order of the court denying his motion for a new trial and the judgment of conviction entered upon the verdict of the jury finding him guilty of manslaughter, as herein stated.

The transcript shows that the appellant Loomis and the deceased E. J. Wilson were ranchers living some three or four miles apart in the agricultural section of San Joaquin County lying northeast of the town of Ripon; that Loomis and Wilson had resided in that neighborhood at least seven years previous to the fourteenth day of April, 1927; that the appellant and the deceased had been acquainted for that period of time and had exchanged a limited number of calls or visits; that some two years previous to the fourteenth day of April, 1927, the wife of the deceased had died, and that thereafter Wilson made more frequent visits at the home of the appellant. The evidence shows that the deceased, for a period covering

about six months prior to April 14, 1927, had several times come to the home of the appellant and taken the wife of the appellant out to card parties and other places of amusement. The evidence does not show just how many times the deceased had taken Mrs. Loomis out to different places of amusement, but it does show that the appellant consented to Wilson taking Mrs. Loomis out to the different places. The family of the appellant consisted of himself, his wife, and a minor daughter of the age of about eight years. It further appears from the testimony that some time previous to the second day of April, 1927, and on or about the twenty-seventh day of February, 1927, the deceased took Mrs. Loomis for an automobile ride on a road leading from Escalon to Farmington, and during the ride violated the person of Mrs. Loomis. Some conversation thereafter which took place between the deceased and Mrs. Loomis is set forth in the transcript to the effect that the deceased insisted that Mrs. Loomis should not make known to the appellant the wrongful acts of the deceased, it appearing that the deceased apologized for his unwarranted conduct and promised never again to repeat such conduct. Thereafter Mrs. Loomis, not mentioning to her husband the conduct of the deceased just referred to, upon the invitation of the deceased and the urging of her husband, accompanied the deceased to one or two places of amusement, and on the second day of April, 1927, without having said anything to her husband about the acts of the deceased, again accompanied the deceased to a card party. Upon returning home from the card party, the deceased took Mrs. Loomis to his own residence, and there, according to the testimony of Mrs. Loomis, against her wish and consent, again violated her person. After this occurrence the deceased once more became penitent and apologized, and on the eleventh day of April, 1927, invited Mrs. Loomis to accompany him to some party or place of amusement. Mrs. Loomis refused this invitation, and after the departure of the deceased, upon being pressed by her husband as to her reason for declining to go out with the deceased, as he (Loomis) could not go, related to her husband the acts of the deceased herein mentioned. On the following day the appellant, with his wife, drove over to the residence of the deceased in an automobile, and there, in the presence of one or two

witnesses, had a conversation with the deceased in relation to the conduct of the deceased toward the wife of the appellant. In this conversation the deceased manifested no disposition to discontinue his acts toward the wife of the appellant. Thereafter the appellant and his wife drove over to the town of Modesto where a physician was consulted to ascertain if any infectious disease had been communicated to Mrs. Loomis by reason of the conduct of the deceased. The appellant and his wife then returned to their home and continued working on their farm until about 11 o'clock on the fourteenth day of April, 1927, when the appellant and his wife again drove over to the home of the deceased. Before leaving on this second visit the appellant took with him an automatic revolver, placing the same in his right-hand hip pocket. Upon reaching the residence of the deceased, and inquiring of an electrician who chanced to be there, of the whereabouts of the deceased, the appellant ascertained that the deceased was at work out in the fields mowing alfalfa. Thereupon, the appellant, together with his wife, drove over in their automobile to where the deceased was mowing alfalfa and waited for the deceased to come around to that portion of the field nearest to the course over which the appellant had driven his automobile. According to the testimony of Mrs. Loomis, the deceased stopped his mowing-machine right by the automobile just mentioned; that the appellant and Mrs. Loomis remained in the automobile; that the right front wheel of the automobile was about opposite the left side wheel of the mowing-machine; that the deceased, after stopping his mowing-machine, came up to the right side of the automobile; that the appellant asked the deceased what he had to say about the occurrences, and the deceased remarked that he had nothing to say; that at the time of this conversation the deceased was standing by the right side of the automobile with one of his hands against the door thereof; that at this juncture the appellant got out of the automobile and went around the rear thereof and leaned up by the hind wheel against the fender. At this instant of time the appellant addressed the deceased as follows: "Earle, I just want to know if you acknowledge that you forcibly assaulted my wife"; to which the deceased replied, "Yes, and what is more I will do it again; I will get rid

of you and then I will get her.'' After saying this, the deceased made a lunge at the appellant and hit him. The witness did not see the blow, but says she heard it; that she saw the deceased pass by her as he moved toward the appellant; that she heard a thud as of something falling; that she immediately looked around and the appellant was getting up; that after the appellant got up, deceased again started toward him with his hands raised; that at this time the appellant had his right hand raised, holding therein the gun to which we have referred, and that as the deceased started toward the appellant the second time, the appellant fired one shot. The deceased hesitated a moment, ran over toward the mowing-machine and hesitated there a moment as the appellant fired a second shot; that the deceased then ran in an easterly direction over the checks in which the alfalfa field was divided; that the appellant followed the deceased some little distance, during which period of time several shots were fired; that after the deceased had reached a point which is shown by the testimony of other witnesses to be at a distance of 203 feet from where the shooting began, the deceased turned and faced the appellant, and the appellant, according to his testimony, at a distance of some 15 feet, again fired at the deceased, whereupon the deceased, after taking a step or two, fell to the ground and was later taken up dead. The testimony of the appellant shows that he followed the deceased from the time he began firing at him when they were standing alongside the automobile until the deceased fell to the ground at a point, as we have stated, 203 feet distant, and that he fired at the deceased until his revolver was empty. The testimony of other witnesses who measured the ground was to the effect that the distance from the automobile to the place where the body of the deceased lay was 203 feet, and that along the course which was taken by the parties from the time the shooting began until its termination, five cartridge shells were found corresponding to the kind and size suited for use in the automatic pistol belonging to the appellant; that two of the shells were found within close proximity of the body of the deceased, one being about 12 feet therefrom and the second at a few feet greater distance. The other shells were along the course over which the parties traveled. The testimony of the appellant is to the

effect that he was afraid that the deceased was about to do him some great bodily harm; that the deceased was a larger man than he, and that the appellant was afflicted with defective eyesight and could not distinguish objects, without the aid of his glasses, more than a few feet distant, and that he was afraid the deceased would break his glasses and render him helpless; that he pursued the deceased, thinking that the deceased was going to the mowing-machine for the purpose of getting a rifle or revolver. The testimony, however, shows that the deceased did not obtain any revolver, rifle, or any instrument whatever by which he might defend himself against being shot by the appellant, and that the appellant fired several shots at the deceased after the deceased had left the vicinity of the mowing-machine. The testimony of Dr. Johnson, who performed the autopsy, shows that several wounds were inflicted upon the body of the deceased, and that the wound which caused the death of the deceased entered the front left side of his body, pierced the aorta or large blood vessel leading to the heart, passed through other organs of the body and shattered one of the vertebra of the spinal column; that death necessarily followed very quickly after the infliction of this wound; that after receiving a wound of this kind shattering the vertebra, the person so wounded would immediately drop to the earth and remain there until death; that it would only be a few seconds—the language of the physician being, "Death would follow probably in a few seconds, if it ran into minutes at all." That none of the other wounds which he had described were necessarily fatal. Dr. Johnson also testified that the autopsy revealed that one of the bullets entered the body from the rear, inflicting a severe, though not necessarily fatal injury. There is no testimony in the transcript contradicting that of Dr. Johnson which we have just stated in relation to the wounds received by the deceased, and of the fact that the wound which pierced the aorta and other organs of the body between the aorta and the spinal column and shattered one of the vertebra of the deceased was such as necessarily to cause the deceased to fall to the ground and to expire within a few seconds, and therefore the jury could only conclude that the fatal shot was the one which brought the deceased to the ground at a distance of 203 feet from where

the shooting began, and that this shot was fired after the deceased had retreated for the distance mentioned and was facing the appellant without anything in his hands whatever, indicating that the deceased possessed either the power or entertained the intent to inflict upon the appellant any grievous bodily injury.

Before the testimony of the appellant and Mrs. Loomis had been introduced, the physical facts introduced in evidence, as we have herein summarized them, establish conclusively that the appellant had pursued the deceased and fired at him at least five different times, inflicting the fatal wound at the end of the pursuit; that the deceased not only retreated to his mowing-machine, which was only a few feet away, and to a point much farther distant, in his attempt to escape death, and at no time after the first shot was fired was in a position menacing the appellant. The testimony of the appellant and of the appellant's wife coincide exactly with what the physical facts surrounding the affray disclose and show that the appellant pursued the deceased, as we have stated, and that the deceased at no time had any weapon or instrument of any kind with which he could inflict grievous bodily injury upon the appellant. The only difference between what the physical facts of the encounter disclose and the testimony of the appellant is that the appellant testified that he was afraid the deceased was going to get a gun or revolver at the mowing-machine and that thereafter he was still afraid of the deceased. The testimony of the appellant, after the first shot, fully discloses the character of the pursuit. Answering a question as to what the deceased did after the first shot was fired, the appellant testified: ''Then he (referring to the deceased) started to run southeast and when he got to the mowing machine he slowed up a little and I thought maybe he went after a gun; then he quit running toward the mowing machine and he run about straight east, so by that time I got it into my head that I had to chase him. I knew if he ever got a gun or anything from the mowing machine it would be all off with me. I could not think of anything else, and all I thought of was, if he gets me, it is good night with the wife. I knew he might kill her for telling on him. He told me what he had done and I didn't know what he would do, so he started running out there and I

followed him out and he ran over a border. The wind was blowing very hard and it blew his hat off. He turned around and stopped like he was going to go after his hat or get me and I shot at him twice more on the run; he kept going east and southeast and he run pretty near south and when I saw him coming and crowding through there I headed him off. I thought he was going back to the car or the mowing machine, or something, and then we got out on the place where it had been mowed. We were pretty near to the ditch or the levee or something there, and he was about twenty-five feet east of me, and I kind of run up on that levee and stopped and he saw I was stopping and he stopped and looked at me. He was maybe 15 or 18 feet east of the hump which I was standing on, and so I stood there and looked at him part of a minute, probably, and he looked at me and he started straight toward me and I kept standing there and threw up my hand with my gun beside me. I did not say anything to him; he looked at me and started toward me and I kept motioning to him two or three times to try to make him stay away, and as he got 8 or 10 feet from me I kept a-shooting until he was right close on me, and as he went almost past me he fell down and rolled over.'' This testimony of the appellant corresponds with the physical facts as to the shells being found close to the body of the deceased, and also to the testimony of Dr. Johnson that the fatal shot was fired after the pursuit had continued for the distance herein mentioned. It may be here stated that the testimony shows that the place where the deceased's body was found was much farther away from the automobile than the mowing-machine. That the mowing-machine, as shown by the testimony of Mrs. Loomis, was close by the automobile, and that the deceased was all the while getting farther and farther away from the automobile until he turned and faced the appellant just before the fatal shot was fired.

As disclosed by the physical facts and the testimony of the appellant and of the appellant's wife, to which we have referred, the appellant was beyond any reasonable doubt guilty of the crime of murder as charged in the indictment returned against him. This *résumé* of the testimony has become necessary by reason of the alleged mis-

conduct of the district attorney, to which we will hereinafter refer.

Two grounds of reversal are urged by the appellant; first, that the court erred in its instructions to the jury, in refusing to give certain instructions requested by the defendant; and, second, misconduct on the part of the district attorney. ■ It is first urged by the appellant that the court erred in giving to the jury the following instruction: "The defendant in a criminal action is by law presumed to be innocent until the contrary is satisfactorily proven by competent evidence." A reference to the transcript shows that this is only an excerpt from the instruction given. Just preceding these words the court instructed the jury as follows: "In criminal cases guilt must be established beyond a reasonable doubt and to a moral certainty, and the burden of proof is upon the People." Immediately following are the words which we have quoted as alleged to be error on the part of the trial court, but as is readily seen when the whole instruction is read, no error appears. Immediately following is given an instruction relative to reasonable doubt, being the instruction taken from the Massachusetts case which has been followed in this state for years. ■ It is also urged that the court erred in instructing the jury as follows: "In viewing and weighing the testimony of each and all of the witnesses in the case you have a right to consider their demeanor and manner upon the stand, their interest in the result of the trial; how far their testimony appears consistent or inconsistent in itself; how far it is contradicted, if at all, by other facts and circumstances and testimony in the case, whether their recollection as to matters to which they testified is clear and distinct." A number of authorities are cited by appellant having to do with cases where the trial court singles out the defendant and gave an instruction relative to his testimony, his demeanor upon the witness-stand, interest, etc. These cases have no bearing upon the instruction given by the court. What the court instructed the jury is mere commonplace, and are matters which the jury, if reasonably intelligent, would take into consideration without any instruction from the trial court, and being applicable to all the witnesses who testified, no error was committed by the court in the giving of the instruction just quoted. ■ It has been

held that an instruction singling out the testimony of the defendant is not sufficient ground for reversal, although the giving of such an instruction has consistently been condemned. (*People* v. *Borjorquez*, 35 Cal. App. 350 [169 Pac. 922], and concurring opinion by Mr Justice Hart.)

The court also gave to the jury the instruction which was given by the trial court in the case of *People* v. *Vukich*, 201 Cal. 290 [257 Pac. 46]. The instruction involved is the one relating to a defendant taking the law in his own hands to avenge a real or fancied grievance. In the Vukich case the giving of the instruction was held proper, and in the case at bar, even though the appellant relied solely upon the plea of self-defense, all the circumstances detailed by the appellant himself and by Mrs. Loomis laid the foundation for the giving of the instruction. These circumstances were all well calculated to arouse in any normal man a feeling of hostility toward the violator of his home and a desire to avenge himself for the injury. The point is also made that the court refused to give certain instructions on the subject of self-defense, requested by the appellant. A reference to the transcript, however, shows that the court carefully and painstakingly instructed the jury upon this subject in language as clear and direct and as fully covering the subject as would have been the case had the court discarded the instructions given, and used the instruction proposed by the appellant.

The refusal to give the instruction numbered 22 requested by the appellant is also alleged to constitute error. The proposed instruction reads: "If any one, or any number of you, after deliberating upon all the evidence in the case, shall be of the opinion that the defendant has not been proven guilty by the evidence in the case to a moral certainty and beyond a reasonable doubt, those entertaining that opinion should vote for a verdict of not guilty, and should adhere to that point until convinced beyond all reasonable doubt that they are so wrong." While the giving of an instruction similar in language to the one requested has been held proper in many cases, the refusal to give such an instruction has likewise consistently been held not to constitute, in and of itself, sufficient cause for reversal. (See *People* v. *Grahle*, 67 Cal. App. 183 [227 Pac. 227], and a large number of cases there cited.) Without

going further into the alleged errors of the trial court relative to the instructions given to the jury, it is sufficient to say we have carefully examined all the instructions given and refused, and find that the trial court fully and fairly instructed the jury as to all the law involved in this case, and that no reversible error can be found either by reason of the instructions given or the requested instructions refused.

We have finally to consider the alleged misconduct of the district attorney. This misconduct consisted in asking questions in the cross-examination of Mrs. Loomis while on the witness-stand for the defendant, and also of questions asked the defendant. Before considering the questions we will state that the transcript shows that the jury was instructed to disregard the questions asked by the district attorney, and to which no answers were permitted. It is, however, urged here that the misconduct was such as to render ineffective any instructions that might be given to the jury by the trial court. Upon cross-examination the district attorney asked Mrs. Loomis the following questions: "Q. Isn't it a fact that at that time and place you had a conversation with Mrs. McAlpine that you had several operations, that you were all cut up inside, that you had your ovaries taken out, that the reason was that you had contracted a venereal disease in Modesto and brought it home, communicated it to your husband and told him as an explanation that you had gotten if off a toilet seat or that he had gotten it off a toilet seat?" "Q. Had he within a year prior to this occurrence at any time, did your husband say anything to you concerning the fact of his parentage of your child? (Rep. Trans., p. 501, 1. 18.)" Upon cross-examination of the defendant the district attorney asked the following questions: "Q. Do you know whether or not your wife's ovaries have been removed? (Rep. Trans., p. 607, 1. 19.)" "Q. Isn't it a fact that in April, 1926, your wife filed a divorce complaint against you? (Rep. Trans., p. 608, 1. 26.)" "Q. Isn't it a fact, Mr. Loomis, that your wife filed a divorce complaint against you within a year prior to this shooting, wherein she stated and alleged that you— (Rep. Trans., p. 611, 1. 16.)" At the time of asking the question of the defendant relative to a divorce action having been begun against him by his wife, the district attorney

had in his hand what is said to have been a copy of the complaint in such action, but as that is not a part of the record, we know nothing of its contents and shall pass the incident by with the statement that the transcript shows absolutely nothing upon which to base the question, and with the further statement that the transcript shows nothing which would lead to the conclusion that the asking of this question amounted to any serious misconduct, or could have had any prejudicial effect upon the minds of the jurors. With this statement, before considering the relevancy or irrelevancy or alleged prejudicial effect of the asking of the other questions, we will refer to the case of *People* v. *Cook*, 148 Cal. 334 [83 Pac. 43], upon which the respondent particularly relies to show the propriety of the district attorney propounding the various questions set forth herein. In the case just cited the defendant was being tried on the charge of having murdered one Max Krieger. The facts disclosed in the opinion in that case show that the defendant had a grown daughter with whom he was having illicit relations; that Krieger was paying attention to the daughter, whether with honorable or other intent does not appear, but for the purpose of showing a motive for the killing of Krieger by the deceased, the prosecution was permitted to introduce testimony tending to show the illicit relation between father and daughter; that the defendant was actuated by the fear that Krieger, a rival for his daughter's favors, would become possessed of knowledge of the criminal relations existing between father and daughter, and, therefore, through motives of jealousy and to conceal his own criminal acts, killed Krieger. It is true that in that case the testimony was offered of illicit relations upon a promise of the district attorney to connect it up with the defendant to show a motive, as herein stated, subject to a motion to strike out, and no motion was made, but the court, in its opinion, held such testimony, under the circumstances, admissible. The judgment in that case, however, was reversed on other grounds.

The case of the *People* v. *Smith*, 143 Cal. 599 [77 Pac. 449], is also called to our attention in connection with the Cook case. In the Smith case the question turned upon the good or bad faith of the district attorney, and need not be further adverted to herein. The circumstances involved

in the Cook case are almost the antithesis of those involved in the case at bar. In the Cook case the commission of a separate and distinct crime was sought to be shown as a motive for the commission of the offense upon which the defendant was being tried. Under such circumstances the law seems to be well settled that other offenses may be shown when there is a reasonable connection between the offense charged and the offense sought to be shown so that the latter may reasonably be said to be connected with, and furnish a cause for the commission of the crime for which the defendant is being tried. All the cases relating to the introduction in evidence of separate offenses as the motive for a commission of a second offense are not pertinent here, for the simple reason that the questions involved do not relate to separate offenses committed by the defendant. A parallel set of circumstances would have been presented if, in the Cook case, the daughter of the defendant had been asked questions indicating that she had had certain operations performed upon her body by reason of some former unlawful relations with parties other than the defendant. If motive there was for the defendant killing Wilson in this case, it was the alleged violation of his home by the deceased. The fact that Mrs. Loomis had told something to a Mrs. McAlpine about her condition had absolutely nothing to do with the motive of the defendant in killing Wilson, assuming that he was actuated by a spirit of revenge and a desire to kill the deceased on account of the deceased's invasion of the defendant's home. If Mrs. Loomis were assumed to be a woman of dissolute character, as the question indicated, it certainly would not tend to show any additional motive on the part of the defendant to kill Wilson. If the killing took place under circumstances justifying the homicide on account of the invasion of the defendant's home, it would not be any more justified because the wife of the defendant was a dissolute character, nor would it be any less justified. At the time the questions were asked which we have set forth herein, there was nothing in the case indicating that the defendant relied upon anything other than the plea of self-defense; that the deceased was the aggressor in striking the defendant preceding the shooting. It was not a case of sudden passion or irresistible impulse following the discovery of the de-

ceased in some illicit act with the wife of the defendant, and therefore what Mrs. Loomis may have told Mrs. McAlpine was wholly inadmissible. It could not have been admitted on the theory of proving the defendant at least guilty of manslaughter, for the simple reason that there was nothing in the case showing a homicide following a sudden heat of passion or an irresistible impulse, but only a homicide following, at most, the striking of a blow by the deceased upon one shoulder of the defendant sufficient to fell him to the ground. Likewise, the question relative to the paternity of the eight year old child involved in the second question presented nothing proper for the jury to consider, as disclosed by the facts set forth in the transcript. That the defendant was or was not the parent of the child bearing his name would not bear upon the question of whether the defendant did or did not kill the deceased in necessary self-defense.

The supreme court of this state has had occasion in numerous instances to condemn questions which have for their purpose only the degrading of the witness. That the first question which we have set forth herein, propounded to Mrs. Loomis, was inadmissible, clearly appears by reversing the situation, placing Mrs. McAlpine on the witness-stand and asking her if Mrs. Loomis did not relate to her what is set forth in the question. That the question tended to degrade the witness in the eyes of the jury seems to us clearly apparent because of the imputatious and intendments contained therein. Questions tending only to degrade the character of the witness have been condemned in the following cases: *People* v. *Wells*, 100 Cal. 459 [34 Pac. 1078]; *People* v. *Dong*, 106 Cal. 83 [39 Pac. 12]; *People* v. *Crandall*, 125 Cal. 129 [57 Pac. 785]; *People* v. *Bowers*, 79 Cal. 415 [21 Pac. 752]; *People* v. *Lee Chuck*, 78 Cal. 317 [20 Pac. 719]; *People* v. *Tufts*, 167 Cal. 266 [139 Pac. 78]. Other cases might be cited, but these are ample to show that where such questions are propounded by the district attorney, sufficient misconduct is presented necessitating a reversal. In some of the cases, as in *People* v. *Smith*, 143 Cal. 596 [77 Pac. 449], where the question of misconduct of the district attorney, upon argument of the cause to the jury was presented, a distinction is made between the good faith and bad faith characterizing the

alleged misconduct. The effect on the jury in the case at bar from the asking of the questions which we have set forth herein could not very well be any different whether propounded in good or in bad faith, and differs from words that may be uttered in the heat of argument, because the jury, as ordinarily intelligent men and under the instructions of the court, would readily make the distinction between the evidence and the argument of counsel. Some of the cases also present the question as to whether the trial court immediately instructs the jury to disregard the questions propounded by the district attorney. In the case at bar it appears that the vitally objectionable questions were immediately followed by instructions from the court to disregard the same.

Admitting that the questions propounded by the district attorney were prejudicial in their character, and were questions which should not have been propounded, this cause still presents a different situation from one where, under sharply conflicting evidence, the jury has brought in a verdict of murder involving either life imprisonment or the infliction of the death sentence. Under the testimony set forth in the transcript and as summarized herein, whether the questions of the district attorney were propounded in bad faith or in good faith, or under the assumption that they were admissible, or from lack of familiarity with the rules of evidence, must be held immaterial. This is true because if the testimony of the defendant and the testimony of Mrs. Loomis be taken at full face value, it nevertheless appears that the homicide was committed under circumstances which establish that there could have been in the mind of the defendant no reasonable belief that his own person or the person of his wife was in actual peril. ▆ It is not enough that the defendant may believe himself in peril in order to justify the taking of human life, but the circumstances must be such as to give reasonable cause for such a belief. After the first shot was fired by the defendant, the testimony of the defendant himself and the testimony of Mrs. Loomis, taken at its full face value, shows that there was no reasonable grounds or appearances for believing that the deceased was about to inflict upon either one of them any grievous or other injury. Their own testimony shows that the deceased was retreating; that he

was unarmed; that the deceased retreated to the mowing-machine and then sought safety by further flight; and that the defendant followed the deceased for a trifle over 200 feet, and then and there inflicted the mortal wound. Under such circumstances the jury would have been justified in returning a verdict of murder, based upon the testimony of the defendant and Mrs. Loomis, accepting the testimony of both of them at full face value. The verdict of manslaughter returned by the jury in this case can only be reconciled with the testimony by concluding that the jury acted upon the assumption that a man who invades the home of another deserves to be shot. ■ Under section 4½ of article VI of the state constitution we are prohibited from interfering with the verdict in this case because no matter how objectionable the questions propounded by the district attorney may be, the jury was not warranted, under any aspect of the case, in returning a verdict of acquittal, and in returning a verdict of manslaughter, the utmost leniency was extended to the appellant. The homicide in this case grew out of the invasion of the home of the appellant by the deceased, but while juries usually modify the verdict in such cases, the law does not recognize homicide therefor as either justifiable or excusable except in certain instances not shown by the evidence in this case. Here the homicide occurred several days after the alleged invasion of the home of the appellant.

The judgment and order of the trial court are affirmed.

Finch, P. J., and Hart, J., concurred.