[Crim. No. 22834. First Dist., Div. Two. Sept. 23, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
LLOYD LAVERNE WALTON, Defendant and Appellant.

COUNSEL

Damian B. Smyth, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, William D. Stein, Assistant Attorney General, Herbert F. Wilkinson and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GRODIN, P. J.—One summer day Lloyd Laverne Walton was working outside the leather goods shop which he operates next to his home in the vicinity of Santa Rosa, California, helping a customer load leather into a van, when he saw two men whom he believed had come to conduct a drug transaction at a house down the street. The occupants of the house had moved in three months before, and "strange things relating to gangs and violence" had taken place there ever since. Other neighbors, as well as Walton, believed that the occupants were dealing in drugs. Walton had called the police five or six times, but to no apparent avail.

The two men were sitting in a car parked in front of the van that was being loaded and Walton went to talk with them. The driver said they were waiting for someone down the street. Walton said if they were

waiting for a drug deal they should please go down the street, and not stay in front of his house. He warned them that if he found them there again he would "put holes" in their car. He also told them the next time he would come out shooting.[1]

The two men left in their car, and Walton and his customer walked back to Walton's house. As they were walking, the customer told Walton, who was hard of hearing, that one of the two men had hurled an obscenity at Walton as he drove away. Walton stormed into the house, returned to the front door with a pistol in his hand, and fired four times into the air. By this time the car had left, but 20 minutes later Walton looked outside his front window and saw another car parked down the street. Believing that this car was linked to the first, Walton walked down the middle of the street toward the car with a gun and holster at his side. As he approached the vehicle, the driver asked, "What's happening?" Appellant pulled the gun out of its holster, and extended his right arm, holding the gun, through the open car window. The occupant of the car, who also had a gun, lay down on the front seat, and he and Walton both shot at each other at the same time. A full-blown shootout followed, as a result of which Walton was shot in the abdomen.

As it happens, the occupants of both cars were undercover officers who were waiting for a contact to come out of the house down the street so that they could arrest the occupants for drug dealing. Walton was convicted of assault with a deadly weapon, with enhancements for use of a firearm and brandishing a firearm.[2]

■ Although Walton and several witnesses on his behalf told a somewhat different version of the events, he does not question the sufficiency of the evidence to support the verdict. Rather, he argues that he was justified in using self-help measures against what he reasonably believed to be violations of the law under circumstances in which the authorities had failed to respond. Relying upon *United States* v. *Holmes* (C.C.E.D.Pa. 1842) 26 F.Cas. 360 (No. 15,383), where the captain of a boat was charged with murder when he selected some passengers to

---

[1] The men in the car so testified. Our description of the facts is based upon the record viewed in the light most favorable to the prosecution. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 245, pp. 4236-4238.)

[2] The court, following the recommendation of the probation officer, ordered imposition of sentence suspended for three years, placed Walton on probation for that period, and ordered that he serve six months in the county jail, with execution of the jail sentence stayed pending appeal.

jump overboard to lighten the boat in order to preserve the lives of the majority,[3] he suggests that he and his neighbors had been "cast adrift in their lifeboat on an unpoliced ocean" through no fault of their own. The general principle precluding resort to self-help (*People* v. *Vukich* (1927) 201 Cal. 290 [257 P. 46]; *People* v. *Loomis* (1927) 86 Cal.App. 768 [261 P. 512]) ought not to apply, he insists, where the premise for that principle—that adequate protection will be provided by the authorities—is shown to be invalid. He invokes Thomas Aquinas (Summa Theologiae I-II, Q. 96, A. 6) for the proposition that the "doctrine of necessity" applies where "the peril be so sudden as not to allow for the delay involved by referring the matter to authority."

Walton's argument is a creative one, and not entirely devoid of sympathetic appeal. The principles of our legal system do not, however, permit its acceptance. Although Walton advanced a theory of self-defense at his trial, that theory was rejected by the jury. That Walton believed, perhaps reasonably, that the persons in the two cars had come to the neighborhood in order to engage in illegal drug traffic, and that the authorities had been unresponsive to his and his neighbors' earlier complaints did not justify his vigilante tactics. A private person may arrest another for a public offense committed or attempted in his presence, or when the person arrested has committed a felony though not in his presence, or when a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it (Pen. Code, § 837); but he may use no more force than reasonably necessary. (Pen. Code, § 835; see *People* v. *Piorkowski* (1974) 41 Cal.App.3d 324, 330 [115 Cal.Rptr. 830].) Walton did not make an arrest, and it is doubtful that the facts would justify his doing so. The fact that in this case Walton was wrong, both in believing that the authorities had failed to investigate the illegal activity and in believing that the person he shot was engaged in an illegal activity, illustrates vividly the value of these principles.

█ Walton also contends that the trial court committed reversible error in failing to instruct the jury *sua sponte* that a conviction for assault may not be grounded upon an intent only to frighten. The proposed instruction is a correct statement of the law (*People* v. *Puckett* (1975) 44 Cal.App.3d 607, 614 [118 Cal.Rptr. 884]), but it does not follow that a trial court has a duty to give such an instruction *sua sponte. (People* v. *Vidaurri* (1980) 103 Cal.App.3d 450, 463 [163 Cal.

---

[3]In *Holmes*, the captain was found guilty, but sentenced to only six months in jail because of the extenuating circumstances.

Rptr. 57].) Here, as in *Vidaurri* (*id.*, at p. 462), the instructions that were given made clear to the jury that the defendant must attempt to inflict violent injury upon the victim in order to be guilty of assault with a deadly weapon.[4] Walton relies on *People v. Marceaux* (1970) 3 Cal.App.3d 613, 619-620 [83 Cal.Rptr. 798], for the proposition that where the evidence of intent is equivocal a specific instruction on intent only to frighten must be given; but *Marceaux* was criticized in *People v. Rocha* (1971) 3 Cal.3d 893, 899, footnote 8 [92 Cal.Rptr. 172, 479 P.2d 372], as an incorrect interpretation of the criminal intent required for assault. *Rocha* affirmed that instructions such as those given in the instant case are sufficient (*id.*, at pp. 899, 900, fn. 13), and *Vidaurri* is consistent with *Rocha.* Walton would distinguish *Vidaurri* on the ground that in that case defendant offered no testimony that he intended only to frighten anyone by the use of his deadly weapon, but we do not regard *Vidaurri* as relying upon that distinction. Moreover, Walton's theory that he intended only to frighten was predicated on his testimony that the passenger in the car shot at him first, and that his gun was still in the holster at the time. The jury apparently did not believe his testimony.

The judgment is affirmed.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied October 22, 1982.

---

[4]The trial court defined "assault" for the jury as follows: "An assault is an unlawful attempt coupled with the present ability and the general criminal intent to apply physical force upon a person of another. [¶] In order to prove the commission of the crime of assault, each of the following elements must be proved: 1) That an attempt was made to apply physical force upon the person of another, and 2) That such an attempt was unlawful, and 3) That ... at the time of such an attempt, the person who made that attempt had the present ability to apply such physical force, and 4) That the person making the attempt had general criminal intent which in this case means that he intended to commit an act of direct, natural and probably subsequent, which, successfully completed would be the application of physical force upon the person of another. [¶] To constitute an assault, it is not necessary that any actual injuries be inflicted, however, if an injury is inflicted, it may be considered in connection with other evidence in determining whether an assault was committed." This instruction was based on CALJIC No. 9.00 (1980 revision). Other instructions relevant to assault that were given include: CALJIC No. 3.30 (1979 revision), CALJIC No. 9.03 (1979 revision), and CALJIC No. 9.08 (4th ed. 1979).