[No. G004613. Fourth Dist., Div. Three. June 23, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
SPENCER CASSANOVA HECKATHORNE, Defendant and
Appellant.

**COUNSEL**

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Frederick R. Millar, Jr., Rudolf Corona, Jr., Yvonne H. Behart and Gilbert Gonzales, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CROSBY, J.**—A jury convicted Spencer Heckathorne of second degree murder with use of a firearm. The trial court prejudicially erred in permitting the prosecutor to cross-examine the defendant concerning details of a prior felony conviction for assault with a deadly weapon, and we must reverse accordingly.

I

Heckathorne celebrated his birthday on October 15, 1985, by consuming cocaine and beer throughout the evening with his wife and friends. Just after two the following morning, during an argument with his spouse, Heckathorne's shotgun discharged. The blast tore through the wall of the next door apartment, fatally wounding Robin Holding.

At the scene, Heckathorne told an officer, "It was an accident. I dropped it, and it went off." Heckathorne's blood alcohol level at the time of the shooting was estimated to be between .19 and .23 percent. He was formally interviewed the same morning and stated the gun discharged accidentally as he tried to unload it.

When examined, the shotgun held four rounds of ammunition in the magazine and one in the chamber. An expended casing was found near Heckathorne's bed. The weapon was in excellent working condition, and tests failed to demonstrate a means by which it could have discharged other than pulling the trigger. A used cartridge could be expelled only by pumping the slide; this action also placed a fresh round in the chamber.

At trial the three surviving occupants of the next door apartment testified for the prosecution and described Heckathorne's behavior in a visit to them on the evening before the shooting. ▮ ▮▮▮ He irritated the group with his braggadocio and statement to one of them, "I could kill you in a minute, just as easy as I could kill a cop."[1] After Heckathorne returned to his own apartment, they heard shouting and swearing as he argued with his wife. Holding and another occupant were in the process of banging on the common wall for quiet when the victim was struck by the fatal blast.

Heckathorne and his wife denied the alleged ferocity of their argument. In addition, they claimed they could not clearly hear the shouts of their neighbors through the apartment wall. Their descriptions of Heckathorne's evening gun loading ritual were also consistent. On the night of the shooting, Heckathorne chambered a cartridge before he left to perform an errand and visit the neighbors. Later, as the couple argued, he was sitting on his bed attempting to remove the shell from the chamber. His wife's back was to him, and she could not see what he was doing. The round would not eject, Heckathorne claimed; and the gun simply discharged. He believed the casing fell on the floor when he pumped the slide to dislodge the live round.

Heckathorne testified he was feeling the effects of the alcohol and cocaine as he tried to unload the gun, and expert testimony confirmed his manual dexterity would be affected at that elevated blood alcohol level. The angle of the shot into the wall was consistent with the position on the bed Heckathorne described.

Heckathorne was impeached with evidence of a 1980 felony conviction for assault with a deadly weapon. The prosecutor's cross-examination on the subject began as follows: "Q   Mr. Heckathorne, if I could deviate for a moment? Back on September of 1980 in the County of Riverside were you

---

[1] For the benefit of the court on retrial, we find no merit in Heckathorne's claim that this statement ought to be excluded. Even considered as hearsay, the statement is admissible as circumstantial evidence of present mental state. (See, e.g., Evid. Code, § 1250.) And it is relevant in that it reveals an inclination toward violence and a readiness to do evil shortly before the killing occurred. Moreover, its probative value clearly outweighs any prejudicial effect in light of the accident defense offered by Heckathorne. (Evid. Code, § 352.) Its usefulness, if any, to prove malice or intent is a matter for the jury.

convicted of a felony of assault with a deadly weapon by means of force likely to produce great bodily injury on a person? A Yes. An automobile. Q I'm sorry. What did you say? A Yes. An automobile. Q Did you try to assault somebody with this automobile? A It was a car accident. Q It was a car accident? A Yes."

Defense counsel then objected on the grounds the prosecutor was improperly examining his client regarding the facts of the earlier offense. The court, after a sidebar argument, ruled Heckathorne had "opened the door" to such questioning and, although admittedly "going out on a limb," allowed further inquiry: "Q I asked you if you had been convicted in 1980 of an assault with a deadly weapon and with force likely to produce great bodily injury. And you said yes. And then you said it was a car, and it was an accident. Do you remember telling us that? A I never told you that. You messed up where I say it was a car accident. I didn't say it was a car and an accident. Q It was just a car accident? A Yes. Q Well, let me ask you this, Mr. Heckathorne. Were you willing to spend time in prison over a car accident? A I got in a fight with the man after. Q Mr. Heckathorne, isn't it true that this man simply cut you off by your belief, and you literally started ramming his car as he is trying to evade you and that you eventually—he jumped out of his car and tried to run from you, and you assaulted him? A That is your belief, I guess. It didn't happen that way. Q Well, did you plead guilty to those charges? A Yes, I did. Q And in your opinion that was just a car accident? A It began as a car accident, yes." Defense counsel's subsequent motion for mistrial was denied.

## II

■ The scope of inquiry when a criminal defendant is impeached with evidence of a prior felony conviction does not extend to the facts of the underlying offense. (*People* v. *McClellan* (1969) 71 Cal.2d 793, 809 [80 Cal.Rptr. 31, 457 P.2d 871].) Citing a legal text, the Attorney General counters this well-settled rule does not apply where the defendant first seeks to mislead a jury or minimize the facts of the earlier conviction. (See 2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982) § 28.8, p. 932.)

■ The cause before us does not fall within any such exception, however. In response to the prosecutor's initial question on the subject, Heckathorne readily agreed he had been convicted of assault with a deadly weapon, adding only "an automobile." As he was currently on trial for a shotgun killing, the supplementary response was merely a clarification. It did not of itself minimize or mislead. Automobiles, after all, are certainly the most

dangerous commonly employed instrumentalities in our society, even when they are used for their intended purpose and not as weapons.

True, Heckathorne's next response asserted the incident was only an accident. Had it been offered on direct examination, our analysis would be entirely different. But the answer was merely in reply to the deputy district attorney's inappropriate invitation to discuss the facts of the old offense, i.e., "Did you try to assault somebody with this automobile?" The prosecutor should have been bound by the answer and defense counsel's timely objection should have been sustained. Under such circumstances, the prosecution will not be heard to assert the defendant attempted to mislead or minimize the facts of a prior conviction in order to justify an attempt to impeach him by innuendo on an improper and collateral issue.

■ We find the error prejudicial. Circumstantial evidence supported, but did not compel, a murder conviction. Heckathorne was the only witness to the gun's discharge, and his credibility was critical. Much depended on the jury's impression of Heckathorne as an individual who would or would not deliberately shoot a gun into a common apartment wall in conscious disregard of a neighbor's life. The prosecutor's improper questioning elicited inadmissible evidence of a disposition to commit violent crimes without serious provocation or motive and gave him an opportunity to inappropriately describe and characterize the previous incident in the guise of a question: "[Y]ou literally started ramming his car and . . . he tried to run from you, and you assaulted him?" In short, during the brief colloquy the prosecutor was able to portray Heckathorne as a violent hothead. The deputy district attorney repeatedly harped on this theme in closing argument, labeling the defendant a "bad dude," "violent," "abrasive," and "macho." It may be true that Heckathorne is all of those things. But our system has long since determined that individuals are to be tried for their actions, not their characters. The improper cross-examination on the prior conviction violated that principle.

Perhaps worse, the prosecutor's questioning also suggested Heckathorne was a liar, who, despite having served a stint in state prison, nevertheless denied responsibility for the previous crime, now claiming it was an accident. This was particularly prejudicial because the entire defense to the current allegation was accident as well.

Moreover, the evidence by no means compelled the verdict returned by the jury. We simply cannot say there is no reasonable probability that a result more favorable to Heckathorne could not have been reached in the

absence of the error.[2] (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Judgment reversed.

Scoville, P. J., and Sonenshine, J., concurred.

**CROSBY, J.**—I concur specially because I have considerable difficulty with the notion that assault with a deadly weapon is, as a matter of law, a crime of moral turpitude. Nevertheless, four published opinions have so held with nary a dissent on that point. (*People* v. *Valdez* (1986) 177 Cal.App.3d 680 [223 Cal.Rptr. 149]; *People* v. *Means* (1986) 177 Cal.App.3d 138 [222 Cal.Rptr. 735]; *People* v. *Armendariz* (1985) 174 Cal.App.3d 674 [220 Cal.Rptr. 229]; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589 [218 Cal.Rptr. 269]; see maj. opn., this page, fn. 2.) In the face of such unanimity my concerns are possibly unwarranted (and probably of no practical value to this defendant), but I believe they are well-founded.

The law permits impeachment of witnesses with certain felony convictions because it may assist the trier of fact to determine if a former offender

---

[2] Heckathorne also contends assault with a deadly weapon is not a crime of moral turpitude per se. (See *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) Resolution of that question is not necessary to today's decision (except as it might be useful for guidance on retrial), but we note a well-established line of authority holds to the contrary. (See, e.g., *People* v. *Valdez* (1986) 177 Cal.App.3d 680 [223 Cal.Rptr. 149]; *People* v. *Means* (1986) 177 Cal.App.3d 138 [222 Cal.Rptr. 735]; *People* v. *Armendariz* (1985) 174 Cal.App.3d 674 [220 Cal.Rptr. 229]; *People* v. *Cavazos* (1985) 172 Cal.App.3d 589 [218 Cal.Rptr. 269].) In a concurring opinion the author suggests those cases may have been incorrectly decided. The panel expresses no present opinion on the matter but does agree the prior should be "sanitized" at the defendant's request upon retrial because of its similarity to the present offense. (*People* v. *Massey* (1987) 192 Cal.App.3d 819, 825 [237 Cal.Rptr. 734]; *People* v. *Foreman* (1985) 174 Cal.App.3d 175, 180-182 [219 Cal.Rptr. 759].)

Heckathorne has also raised several other issues we need not reach. He claims a police interrogation four hours after the homicide violated his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) From our review of the record and the briefs, the point *is* an exceedingly close one. But the prosecution only used the statement to impeach in the first trial, and events have vindicated that strategy. (See *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] [holding statements violative of *Miranda* remain available for impeachment purposes].) We assume the prosecution's cautious tactics will not change in this respect and consequently decline to engage in the useless exercise of deciding whether a *Miranda* violation in fact occurred.

Heckathorne urges *Marsden* error as well, claiming the court did not make adequate inquiry into his allegations of incompetence of counsel when he demanded a change of attorneys at the sentencing hearing. (See *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].) That point is academic unless the superior court names trial counsel to continue his representation of the defendant. In view of Heckathorne's attack on his performance, it is unlikely that would occur or that counsel would accept the appointment if it did. In any event, there is nothing to prevent Heckathorne from bringing a new *Marsden* attack in that instance before any retrial.

is a present prevaricator. Whether there is any such connection in the real world might present an interesting research project for a behavioral scientist: e.g., "Can There be Honor Among Thieves?: A Social Study Comparing the Propensity to Lie of Doctors, Lawyers, and Indian Chiefs with Inmates of California Prisons." But most persons would probably agree that felonies of recent vintage displaying a dishonest bent, such as treason, theft, and especially perjury, do bear a rational relationship to credibility.

The difficulty arises where, as here, the court is confronted with a felony not involving an element of dishonesty. Years of prosecuting, defending, and judging accused persons have taught me a felony conviction of that sort is not a particularly strong indicator of an individual's truthfulness as a witness. After Proposition 8, however, such a felony may be admissible for impeachment, provided only that it *necessarily* involves moral turpitude. (See *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111].) As *Castro* explained, "felony convictions which do not involve 'readiness to do evil'—moral turpitude, if you will—bears [*sic*] no rational relation to the witness' readiness to lie." (*Id.,* at p. 314.)

The Supreme Court conceded the moral turpitude determination "has proved awkward" in jurisdictions where it has been the rule. (*Id.,* at p. 316, fn. 11.) It added, however, "Some of the problems may be ameliorated by the fact that, in connection with other statutes, considerable bodies of law concerning the characterization of felonies as involving or not involving moral turpitude have developed. [Citations.]" (*Ibid.*) Among the court's citations to this passage is a leading text's discussion of attorney disciplinary proceedings. (1 Witkin, Cal. Procedure (2d ed. 1970) Attorneys, § 195.) But, as will appear shortly, under the present rules attorney discipline cases are poor authority in deciding whether a particular crime is one of moral turpitude; and the Court of Appeal has declined to follow the Supreme Court's assessment of the crime of assault with a deadly weapon in that specific context.

For purposes of impeachment, does assault with a deadly weapon demonstrate a readiness to do evil or moral turpitude or depravity? It probably does in most instances. Throwing a hatchet at a baby, shooting into a crowd, and, as apparently was the case here, deliberately striking another motorist with an automobile would certainly seem to qualify. Oddly, however, the court cannot examine the facts of the former conviction; for it must be viewed in the abstract under the so-called "least adjudicated elements" test. (*People* v. *Castro, supra,* 38 Cal.3d at p. 317.) In other words, if the statute can be violated in a manner not constituting moral turpitude, it cannot be used to impeach no matter how heinous the particular circumstances of the witness's crime. We have recently criticized the similar

"viewed in the abstract" approach used in analyzing the underlying felony for purposes of the second degree felony-murder rule; I believe many of our observations in that case are equally applicable here. *(People* v. *Patterson\** (Cal.App.)

Assault with a deadly weapon is virtually defined by its title. It is an assault on the person of another with a deadly weapon "or by any means of force likely to produce great bodily injury." (Pen. Code, § 245, subd. (a)(1).) Simple assault is merely an attempted battery. At common law it was a specific intent crime because all attempts were, by definition, in that category. For policy reasons, however, California has determined assault with a deadly weapon is nonetheless a general intent crime. *(People* v. *Rocha* (1971) 3 Cal.3d 893, 898-899 [92 Cal.Rptr. 172, 479 P.2d 372]; *People* v. *Hood* (1969) 1 Cal.3d 444, 455-459 [82 Cal.Rptr. 618, 462 P.2d 370].) The policy is based on a frank determination to remove intoxication (not arising to a level of unconsciousness) as a defense to assault with a deadly weapon: "Those crimes that have traditionally been characterized as crimes of specific intent are not affected by our holding here. The difference in mental activity between formulating an intent to commit a battery and formulating an intent to commit a battery for the purpose of raping or killing may be slight, but it is sufficient to justify drawing a line between them and considering evidence of intoxication in the one case and disregarding it in the other." *(Hood, supra,* at p. 458.)

The upshot is, as the law presently stands, intoxicated persons who commit an act amounting to an assault with a deadly weapon may not only be convicted of that crime, but can also be impeached with the conviction when they offer alcohol-free testimony. The thought is a sobering one for several reasons.

To begin with, in the context of attorney discipline cases, the Supreme Court does not view the crime in the abstract *(In re Strick* (1983) 34 Cal.3d 891, 902-903 [196 Cal.Rptr. 509, 671 P.2d 1251]) and has determined assault with a deadly weapon does not necessarily involve moral turpitude. *(In re Rothrock* (1940) 16 Cal.2d 449, 459 [106 P.2d 907, 131 A.L.R. 226].) But, using the required abstract approach in impeachment situations, the Court of Appeal has consistently reached the opposite conclusion with respect to the same offense in opinions the Supreme Court has allowed to remain published. *(People* v. *Valdez, supra,* 177 Cal.App.3d 680; *People* v. *Means, supra,* 177 Cal.App.3d 138; *People* v. *Armendariz, supra,* 174 Cal.App.3d 674; *People* v. *Cavazos, supra,* 172 Cal.App.3d 589.) Several of these cases struggled to distinguish the attorney discipline authority. Their reasoning is unpersuasive to me: "In those cases, the [Supreme C]ourt was

---

\*Reporter's Note: Review granted Sept. 15, 1988. For Supreme Court opinion see 49 Cal.3d 615 [262 Cal.Rptr. 195, 778 P.2d 549].

formulating a standard by which to determine the attorney's fitness to continue his practice according to the ethical standards of his profession. Simple fairness requires the court to look behind the conviction to ascertain the precise nature of the assault and the circumstances in which it occurred. The bare fact of conviction does not determine the attorney's fitness to practice." (*Cavazos, supra,* at p. 595; see also *Armendariz, supra,* at p. 682 [making a similar but equally illogical argument in refusing to accord "simple fairness" to a criminal accused].)

A cynic might observe that the law cannot have it both ways. Under the current system, we either tolerate persons who cannot be trusted to testify truthfully under oath to practice law or we permit some honest persons with life or liberty at stake to be impeached with a conviction that would not merit discipline for an attorney. But why should lawyers, with only a privileged means of obtaining a livelihood in the balance, be accorded more due process, i.e., "simple fairness," than those accused of crimes?

A second major difficulty with the current state of the law is that the line between assault with a deadly weapon and no crime at all is often a very narrow one. For example, throwing a knife in the direction of another may or may not constitute assault with a deadly weapon depending on the proximity of its flight to the alleged victim. (*People* v. *Dodel* (1888) 77 Cal. 293 [19 P. 484].) Pointing a gun at the ground and swinging it about the head while stating, " ' "Don't come any closer; your life is in danger," ' " does not constitute the crime at all. (*People* v. *Diamond* (1939) 33 Cal.App.2d 518, 520 [92 P.2d 486].)

On the other hand, an illegal but conditional threat to shoot where the gun is pointed only at the ground may be sufficient. (*People* v. *McMakin* (1857) 8 Cal. 547.) Of course, if the weapon is unloaded, no assault with a deadly weapon can occur unless it is used as a club. (*People* v. *Sylva* (1904) 143 Cal. 62 [76 P. 814].) Thus, a drunk who encourages another to leave a bar by threatening use of a firearm may or may not be guilty of assault with a deadly weapon. The determination will turn on a fact the defendant may not even know or remember, i.e., whether the gun is loaded.

An assault with a deadly weapon may also be committed by means of force likely to cause great bodily injury. (*People* v. *Chavez* (1968) 268 Cal.App.2d 381, 384 [73 Cal.Rptr. 865].) Consequently, the drunken instigator of a barroom brawl may have his credibility as a witness called into question in future cases merely because he once *unsuccessfully* attempted to kick a fellow patron in such a skirmish. (See *People* v. *Covino* (1980) 100 Cal.App.3d 660, 667 [161 Cal.Rptr. 155] and *People* v. *Hopkins* (1978) 78 Cal.App.3d 316, 320 [142 Cal.Rptr. 572] [no actual injury required in assault with a deadly weapon prosecution].) This is so even though he only

harbored the garden variety general intent required to commit a simple battery. And, viewed in the abstract, not even felony batteries involve moral turpitude. (*People* v. *Mansfield* (1988) 200 Cal.App.3d 82 [245 Cal.Rptr. 800]; see also *People* v. *Coad* (1986) 181 Cal.App.3d 1094, 1114 [226 Cal.Rptr. 386] (conc. and dis. opn. of Kline, P. J.).)

Finally, it is no defense to an assault with a deadly weapon accusation that the accused entertained an honest belief in the need for self-defense, if the belief was unreasonable. (*People* v. *Flannel* (1979) 25 Cal.3d 668, 679 [160 Cal.Rptr. 84, 603 P.2d 1]; *People* v. *Walton* (1982) 136 Cal.App.3d 76, 79 [186·Cal.Rptr. 18].) In *Walton* an overly zealous but civic-minded defendant precipitated a neighborhood gun battle with undercover police officers whom he honestly (but unreasonably) believed to be drug dealers. The conviction was affirmed. Should the testimony of Walton the witness be stigmatized hereafter? The notion strikes me as idiotic. If behavior does have anything to do with credibility under oath, the facts of Walton's crime arguably suggest it is far more likely than not he would be truthful because of his passion for upholding the law. Nor is it reasonable to infer in the more common case, where inspiration for the defendant's past conduct emanated from a bottle or a needle, that he is more susceptible to fudging under oath when sober than other mortals. It is one thing to hold persons responsible as a matter of policy for degrading their own power to reason when they threaten or attempt to injure a fellow human being; that I understand. But it is quite another to suggest the offender is likely to fib in some unrelated proceeding based on that conviction.

The law should be amended in this area in one of two ways. Either assault with a deadly weapon should never be an appropriate offense for impeachment, or the abstract test should be abandoned and trial courts permitted to review the particulars of the offense itself out of the presence of the jury to make the determination our Supreme Court routinely undertakes in attorney discipline cases. Some assaults with a deadly weapon do involve moral turpitude; others within the easy imagination of this observer clearly do not.

Respondent's petition for review by the Supreme Court was denied September 22, 1988. Kaufman, J., was of the opinion that the petition should be granted.