Filed 4/1/16  P. v. Harper CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. DARCY AARON HARPER, Defendant and Appellant. | F069605 (Super. Ct. No. F13908756) OPINION |

-oOo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County. James Petrucelli, Judge.

Sylvia W. Beckman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, and Harry Joseph Colombo, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Franson, J. and Peña, J.

A jury convicted appellant Darcy Aaron Harper of second degree murder (Pen. Code, § 187, subd. (a)),[1] a lesser included offense of the first degree murder charged in count 1, and found true an arming enhancement (§ 12022, subd. (b)(1)) and an allegation that he inflicted great bodily injury on the victim (§ 1203.075). On June 9, 2014, the court sentenced Harper to an indeterminate term of 16 years to life, 15 years to life on his murder conviction and a one-year term on the weapon enhancement.

On appeal, Harper contends the court abused its discretion when it allowed the prosecutor to impeach him with two prior convictions and to question him about the facts underlying the convictions. We affirm.

## FACTS

### *The Prosecution Case*

On September 11, 2013, just before 8:00 p.m., Ghasan Ahmed was working at the Mendota Market when he called 911 to report that Miguel Valencia had walked into the store bleeding and stating that he had been stabbed. Mendota Police Officer Frank Renteria soon arrived at the market and found Valencia sitting against a wall. Valencia told Renteria he met "Darcy" outside the market to buy $10 worth of heroin from him, they got into an argument, and "Darcy" stabbed him. Valencia had a one inch long puncture wound on his upper abdomen. A blood stained, crumpled $10 bill lay on the floor next to him.[2]

After the stabbing, Harper went home and called 911. Harper told the 911 operator that at the Mendota Market, a man hit him in the mouth and the side of the head, and would not let him enter the store. Harper also stated he was disabled, and unable to fight back, and had left the market. Harper did not tell the operator, however, that he was

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] Valencia was eventually airlifted to a hospital where he died on September 13, 2013, from a stab wound to the abdomen caused by a knife that perforated Valencia's abdominal aorta, both lobes of his liver, and his pancreas.

2.

armed with a knife, that he stabbed Valencia, or that earlier, Valencia stabbed him with an ice pick.

Mendota Police Detective Joel Warkentin arrested Harper at his house that night. During a post-arrest interview, Harper told the detective that he was coming out of the Mendota Market when Valencia told Harper he disrespected him. Valencia began swinging a bottle at Harper and kicking at him, and he managed to hit Harper on the stomach. Harper further stated that other people got involved when he tried to run from Valencia. Upon further questioning, Harper stated that Valencia hit him in the mouth and kicked him. After Harper's friend Ramiro Bautista started Harper's car, Harper got in, and they drove away. Harper was adamant that he did not have a pocket knife on him and he denied stabbing Valencia. He also claimed Valencia had a knife, which Harper did not actually see, and that Valencia must have stabbed himself while he swung the knife at Harper. Detective Warkentin did not see any injuries on Harper.

On September 14, 2013, at approximately 6:51 p.m. Detective Warkentin executed a search warrant at Harper's house. In Harper's bedroom, Warkentin found a knife in a sheath located between a mattress and a wall. The knife was "damp and wet." On a TV tray in the bedroom, Detective Warkentin found two baggies that contained methamphetamine. Two thousand one hundred and thirty-eight dollars were found inside a safe in Harper's room.

During a second interview that occurred on September 14, 2013, Harper told Detective Warkentin that Valencia hit him but that he did not hit Valencia or swing at him. He also stated that when he went back to the market the second time, he did not have a chance to get out of his car because Valencia attacked him when he pulled up to the store.

3.

The prosecution introduced into evidence surveillance video from the market, including video from two cameras that showed the actual murder. Relevant portions of the video are discussed below.[3]

### The Defense Case

Harper[4] testified that he lived with his mother, his brother, his ex-wife, and a female friend. Harper was in the end stage of renal failure and had to hook up to a dialysis machine every night at 7:30 p.m., for 12 hours. Some of his veins were worn out from dialysis and he had an access tube in his stomach to connect to the dialysis machine. Harper also had osteoarthritis in both knees, suffered from type 2 diabetes, and was blind in one eye. Bautista went to Harper's house every morning to help him.

On September 11, 2013, at around 5:00 p.m., Harper went to the Mendota Market to buy cigarettes. After returning home, he decided to go back to the market to buy cigarettes for his ex-wife and to meet "Sleepy" who called him while he was home. Before getting into his car to leave, Harper saw Valencia sitting in his parked truck across the street.[5] As Harper drove away from his house, Valencia flagged him down and Harper pulled over. Valencia parked his truck in front of Harper's car. He approached the passenger's door of Harper's car and attempted to open it, but Harper locked it with the car's power locks and told Valencia to come around to the driver's door. Valencia went to the driver's window and asked Harper if he had any heroin. Harper told him he did not and Valencia asked Harper if he had any money. Harper replied that he only had $2, Valencia then swung at him with an ice pick and cracked his window. Valencia kept

---

[3]    Harper told detective Warkentin that he did not know the names of any of the people in the parking lot and that Valencia did not ask him for heroin or anything else that night. He did not, however, tell Warkentin during either interview that Valencia stabbed him with an ice pick.

[4]    Harper was 56 years old at the time of trial.

[5]    Harper initially testified that he encountered Valencia during his first trip to the market.

4.

swinging and hit Harper on the arm twice with the ice pick, causing his arm to bleed. Valencia used obscenities as he told Harper, "You disrespected me, you've got to pay for that." When Harper backed his car into a driveway to get away, Valencia kicked the car's front passenger quarter panel, denting it, before Harper sped off down the street. Harper was scared because his arm was bleeding and he was taking a blood thinner. However, he was able to stop the bleeding by pushing his arm against his shirt and applying pressure.

As Harper drove into the Mendota Market parking lot, Valencia and Sleepy approached his car and he became scared because of his earlier encounter with Valencia. Valencia walked up to Harper's car, opened the door, and began hollering at Harper from as close as six inches away, saying that Harper disrespected him and had to pay for it.[6] He also knocked a cigarette out of Harper's hand and told him, "I know you [have] something, get out of the car." Valencia then punched Harper. At that point, Sleepy approached them and told Valencia to "back off." Valencia told Sleepy it was none of his business. Valencia then moved away from the car, as he continued to tell Harper to get out. Harper got out of the car because he thought Valencia wanted to take his car. However, he retrieved a folding knife[7] from the center console of the car and opened it because he was so scared that he urinated in his pants. Once he got out of the car, Harper walked toward Valencia with the knife in his right hand, by his side, in order to get Valencia to back away as Valencia continued to say "crazy stuff." As they stood in front of Harper's car, Valencia was throwing his hands in Harper's face and telling Harper to

---

[6]     According to Harper, Valencia was upset because he thought Harper had heroin and was not selling it to him. Harper denied ever selling heroin to Valencia. However, during cross-examination Harper admitted that he obtained watches that were found at his house from "selling dope." Later, Harper admitted that in the past he used heroin and sold it.

[7]     Harper testified that including the blade and handle, the knife was about eight inches long.

"come over here" and trying to lure Harper towards him. Bautista came over and Harper told him Valencia had punched him in the face, stabbed him, and now was trying to take his car. Valencia told Bautista it was none of his business, that Harper had disrespected him, and that he was going to pay for it. Harper understood this to mean that Valencia was going to kill him.[8]

As Valencia bent down and began moving towards Harper, Valencia put his right hand behind his back and he told Harper the only way Harper was going home was in a body bag. Harper thought Valencia was reaching for a weapon and he stabbed Valencia with the knife to slow him down so Harper could get away. During this time, Harper was telling Valencia to let him walk away and that Valencia could keep his car. Harper did not just walk away because he was afraid to turn his back on Valencia. After Harper stabbed him, Valencia kicked Harper in the testicles. Harper started backing away, and Valencia started swinging and punching at him. He also kicked at Harper four or five times striking him once and causing Harper's arm to become sore from blocking Valencia's kicks. Harper turned his back to Valencia and he began kicking Harper on the back.

After Valencia stopped advancing, Harper walked up to a black car in which Sleepy was sitting and dropped the knife on the backseat. Sleepy told Harper not to leave because he would get in trouble, but Bautista who was seated in the driver's seat of Harper's car, was telling Harper to get in the car. Harper got in the car with Bautista and Bautista drove to Harper's house. Harper told his mother that he "[thought] [he] stabbed somebody" and he called 911.

---

**8** Harper also testified that he knew Valencia owned a gun and that three or four years earlier, he saw Valencia in an alley holding a gun to a man's face as he took drugs from the man's pocket. He also testified that Valencia always carried an ice pick. When asked about Valencia's reputation for violence in the community Harper stated that Valencia was known as, "the man."

Harper further testified that during his September 11, 2013, interview with Detective Warkentin he was confused. He tried not to tell Warkentin anything because Warkentin said Valencia had been stabbed seven times and Harper knew he did not stab Valencia more than once. Additionally, defense counsel elicited from Harper that he had a 1978 assault with a deadly weapon conviction and a 1988 domestic violence conviction.

Harper acknowledged that the knife found in his room belonged to him but he denied it was the one he used during the stabbing. He also denied that the baggies found in his room belonged to him and he explained that he had a large amount of cash in his house because it was almost "tag time" for his vehicles, "tax time," and "insurance time."

During cross-examination, when Harper was shown a video clip taken during his second trip to the market, Harper identified a dent on the front passenger quarter panel of his car as the dent Valencia made when he kicked the car earlier that day. He also acknowledged that an earlier clip from the market's surveillance video showed that his car already had a dent on the front passenger quarter panel when he went to the market the first time.

Emelia Caballero testified she had known Valencia for about 40 years and had been in an on again, off again dating relationship with him. Approximately seven years earlier, Valencia kicked her in the face as she bent down to pick up some clothes, loosening four of her teeth. In 2010, while living with Valencia, he got mad and struck her in the face with a gun because she had her grandchildren over. On two other occasions, Valencia hit her on the face with his fist.

Dr. Stephanie Bauer testified that she conducted a physical examination of Harper between 1:00 a.m. and 2:00 a.m., on September 12, 2013, to assess him for any injuries or acute medical problems. During the examination, Harper complained only of discomfort along his spine and cervical region from a past fracture. Besides his neck, the only other injuries she noticed were a small contusion on his lower lip and a small hematoma in the subcutaneous tissue on his right arm.

7.

*Rebuttal*

Detective Warkentin testified in rebuttal that when he interviewed Harper on September 11, 2013, he did not notice any wetness around the general area of Harper's pants, and that Harper never told him he urinated in his pants.

## DISCUSSION

*Introduction*

Harper contends the court abused its discretion when it allowed the prosecutor to impeach him with his 1978 assault conviction and his 1988 corporal injury on a spouse conviction because they were remote and he did not have a solid, continuous pattern of criminal behavior. He further contends the court abused its discretion by allowing the prosecutor to elicit facts pertaining to the offenses underlying these convictions and to insinuate Harper used a knife in committing them. We find partial merit to Harper's claim of error but conclude that any error was harmless.

*Background*

The prosecutor provided information to the defense indicating Harper was convicted of assault with a deadly weapon on December 12, 1978, being under the influence of a controlled substance (Health & Saf. Code, § 11550) on June 14, 1984, two counts of misdemeanor vandalism (Pen. Code, § 594) on August 12, 1986, possession of drug paraphernalia (Health & Saf. Code, § 11364) on March 30, 1987, corporal injury on a spouse (Pen. Code, § 273.5) on December 6, 1988, and two counts of possession of a controlled substance (Health & Saf. Code, § 11377) on August 11, 1995. He served separate prison terms on his 1988 corporal injury conviction and on his 1995 drug possession convictions.

Prior to the taking of testimony, the prosecutor moved the court for permission to impeach Harper with his 1978 assault conviction (§ 245) and his 1988 corporal injury conviction (§ 273.5). At a hearing on April 21, 2014, the prosecutor argued that although Harper's 1978 and 1988 convictions were remote, they were admissible for impeachment

purposes, because Harper had not led a crime free life since then and he had served two prison terms. Defense counsel argued the convictions were remote and might make conviction more likely by leading the jury to conclude that Harper was a violent person. In ruling that the prosecution could impeach Harper with these convictions the court stated:

> "All right. I have indicated that given the totality of the circumstances, that I would allow those two. And that will be my order. I will allow for the purposes of impeachment only, if the defendant does testify, the 245 from 1978. While the Court is troubled by the remoteness in time, I think it is incumbent upon the Court to allow that. Also, the 1988 conviction, the 273.5."

On cross-examination the prosecutor asked Harper if during the 1978 assault he stabbed somebody with a knife. Defense counsel objected, but the court overruled the objection. When Harper denied using a knife the prosecutor asked Harper to tell him about the assault. Harper replied that the assault involved him shooting his cousin with a slingshot.

The prosecutor then asked Harper if he used a knife when he committed his 1988 domestic violence offense. Harper replied that he did not and the prosecutor asked him to explain what happened. Harper explained that the incident underlying his corporal injury conviction occurred on a day when he and his children's stepmother were drinking heavily at a barbeque. When they returned home, Harper pushed her against a wall because she cursed at his children, which resulted in her receiving a cut above her eye.

### The Admission of Two Convictions for Impeachment Purposes

> "'[S]ubject to the trial court's discretion under [Evidence Code] section 352 [article I, section 28, subdivision (f) of the California Constitution] authorizes the use of any felony conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty[, for impeachment purposes].' [Citations.] In determining whether to admit the prior convictions, '[t]he trial court should consider four factors outlined in [*People* v.] *Beagle* [(1972) 6 Cal.3d 441 …]: (1) whether the prior conviction reflects adversely on an individual's honesty

9.

or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions. [Citation.]' [Citation.] The first factor goes to admissibility of the prior convictions, which determination the trial court must first reach before exercising its discretion based on the remaining factors. [Citations.]

"'A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.] In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)

Assault with a deadly weapon and infliction of corporal injury on a spouse are crimes of moral turpitude. (*People v. Cavazos* (1985) 172 Cal.App.3d 589, 595; *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402.) Further, neither of these convictions were similar to the charged offense, and the court's decision to allow Harper to be impeached with two convictions did not prevent Harper from testifying.

"[Moreover,] convictions remote in time are not automatically inadmissible for impeachment purposes. Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior. [Citations.] In fact, in *People v. Green*, [*supra*,] 34 Cal.App.4th 165, 183, … the court admitted a 20-year-old prior conviction, reasoning that defendant's 1973 conviction was followed by five additional convictions in 1978, 1985, 1987, 1988, and 1989. The court reasoned that 'the systematic occurrence of [appellant's] priors over a 20-year period create[d] a pattern that [was] relevant to [his] credibility.'" (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926.)

The record supports the court's implicit finding that Harper's assault and corporal injury on a spouse convictions were not too remote to be used for impeachment purposes because he had not led a legally blameless life. Although Harper's 1978 assault with a deadly weapon conviction was almost 35 years old, he was subsequently convicted of four misdemeanors and three felonies, and he served two prison terms. Further, after his

10.

1988 conviction for infliction of corporal injury on a spouse, Harper was convicted in 1995 of two felony drug offenses, and served a prison term. Thus, we conclude that the court did not abuse its discretion when it allowed the prosecutor to impeach Harper with his 1978 and 1988 convictions.

Harper cites the court's statement that although it was troubled by the remoteness of Harper's 1978 conviction it was, "incumbent upon the Court to allow that" to contend the court misunderstood it had discretion to prohibit the prosecutor from using his 1978 and 1988 convictions for impeachment purposes. We disagree.

Harper does not cite any evidence in support of this contention. Further, the court allowed both counsel to argue at length regarding the admissibility of these convictions for impeachment purposes. If the court believed it lacked discretion to exclude these convictions, there would have been no need to hear argument on their admissibility. Thus, it is clear that the quoted comment merely indicates that since the court found Harper's 1978 and 1988 convictions were not too remote to be used for impeachment, it felt obligated to allow the prosecution to use it for this purpose so Harper would not testify with a "'false aura of veracity.'" (*People v. Castro* (1986) 186 Cal.App.3d 1211, 1217.)

### *The Cross-Examination About the Facts Underlying Harper's 1978 and 1988 Convictions*

It is well established that when a prior felony conviction is used to impeach a criminal defendant who chooses to testify at trial, the prosecution is limited to the facts of the conviction, the date, and the nature of the crime committed. (*People v. Allen* (1986) 42 Cal.3d 1222, 1270.) Details and circumstances of the prior offenses are not admissible. (*Ibid.; People v. Schader* (1969) 71 Cal.2d 761, 773; *People v. Smith* (1966) 63 Cal.2d 779, 790; *People v. David* (1939) 12 Cal.2d 639, 646.) Improperly impeaching a witness with the facts of the underlying conviction constitutes misconduct (*People v. Wynn* (1941) 44 Cal.App.2d 723, 731) and requires reversal where there is a reasonable

11.

probability the defendant would have received a more favorable result absent the error. (*People v. Heckathorne* (1988) 202 Cal.App.3d 458, 463-464.)  In accord with the above authorities, we conclude it was improper for the prosecutor to elicit details of the offenses underlying Harper's prior convictions and to ask Harper whether he used a knife in committing the underlying offenses.

Further, "[i]t is well established that a prosecutor may not '"ask questions of a witness that suggest facts harmful to a defendant, absent a good faith belief that such facts exist."'  [Citation.]  In other words, 'a prosecutor may not examine a witness solely to imply or insinuate the truth of the facts about which questions are posed.'"  (*People v. Young* (2005) 34 Cal.4th 1149, 1186.)  Thus, it was improper for the prosecutor to ask Harper if he used a knife in committing the offenses underlying his prior convictions for the additional reason that it does not appear from the record that he had a good faith belief Harper used a knife to commit them.  Accordingly, we also conclude the court erred when it overruled defense counsel's objection to the prosecutor's improper line of questioning.

### Harper was not Prejudiced by the Admission of his Prior Convictions or the Prosecutor's Improper Cross-Examination.

Harper concedes that ordinarily the standard of review for the errors he complains of is whether it is reasonably probable he would have received a more favorable result in the absence of the error.  (*People v. Watson* (1956) 46 Cal.2d 818.)  He contends, however, that because the cumulative effect of these errors infringed on his due process right to a fair trial this court should reverse the judgment unless the errors were harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 22-24.)  Harper further contends reversal is required regardless of the standard applied because the jury had to decide whether the homicide was murder or manslaughter, and this issue "turned on whether or not Harper's testimony about his belief in the necessity to use self-defense was found credible."

Since we have already concluded the court did not abuse its discretion in allowing Harper to be impeached with his 1978 and 1988 convictions, we summarily reject Harper's contention the cumulative errors that occurred here require their prejudicial impact be evaluated under the *Chapman* standard. However, even assuming the court erred as Harper contends and that the *Chapman* standard is the appropriate standard of prejudice we would, nevertheless, conclude the errors were harmless.

The effect of the errors Harper complains of on his credibility pales in comparison to the other evidence that undermined his credibility starting with the surveillance video, which contradicted Harper's version of the stabbing and undermined much of his testimony. Harper testified that when he arrived at the store the second time, he was extremely afraid of Valencia because Valencia had just stopped Harper and stabbed him twice on the arm with an ice pick. He also testified Valencia walked up to Harper's car, opened the door, and began yelling at him from a distance of inches. The video, however, shows that when Harper parked his car, Valencia walked casually up to the driver's door, and stood there for a second before opening the door. Further, if Harper had truly been afraid of Valencia, he had ample time to lock the door like he claimed to have done during the alleged earlier confrontation, but he did not. Additionally, the video shows that after Valencia punched Harper in the face as he sat in his car, Valencia moved away from the car leaving enough room for Harper to get out. However, rather than closing the door and driving away, Harper got out of his car with a knife in his right hand to confront Valencia. Harper testified he was afraid of Valencia and only advanced toward him in order to intimidate him, like Harper would do if he encountered a bear. However, the video shows Harper holding the knife in his right hand, at his side, aggressively moving toward Valencia, backing him up toward the front of Harper's car, and beckoning Valencia with his left hand to move towards Harper. During that time, Harper attempted, at least once, to grab Valencia's right hand.

13.

Harper also testified he was afraid to turn his back on Valencia. The video, however, shows that while Harper was talking to Valencia at the front of Harper's car, Bautista walked up on Harper's right side. Harper *turned his back to Valencia* and then *stood next to him* as he and Valencia both appear to say something to Bautista. The video then shows that after Harper and Valencia moved closer to the driver's door, while Valencia stood within arms' length in front of Harper, Harper extends his right arm towards Valencia and stabs him in the stomach. Harper testified that he stabbed Valencia because Valencia moved toward him, leaned forward and moved his right arm toward his back, which caused Harper to believe Valencia was going for a weapon. The video, however, shows that just prior to being stabbed, Valencia did not make any of these movements.

Harper testified that immediately after he stabbed Valencia, Valencia kicked him in the testicles, kicked him several times on the back, and kicked him several times on the arm. He also testified that after stabbing Valencia, Harper kept the knife in his right hand and warded off Valencia with his left hand because he did not want to injure Valencia further. The video, however, shows Valencia attempted to kick Harper only two times: once right after Harper stabbed him when he kicked at Harper and missed, followed shortly by a second attempt that hit Harper on the lower back. The video also shows that as Harper walks backward away from Valencia, after the stabbing, Harper moved the knife from his right hand to his left hand and that he used it to keep Valencia at bay until Valencia quit following him.

Further, Harper testified that when Valencia stopped him on the street, Valencia stabbed him twice on his left forearm with an ice pick, and kicked his front passenger quarter panel causing a dent on his car. However, the market's surveillance video from Harper's first trip to the market, which occurred prior to Harper allegedly encountering Valencia on the street, shows that the dent Harper attributed to Valencia was already there when Harper went to the store the first time. Additionally, Harper did not tell

14.

Detective Warkentin or Dr. Bauer that Valencia had stabbed him on the arm and neither of them reported seeing any cuts on Harper's arms on the night of the stabbing. Nor did the detective see any wetness on Harper's pants, which contradicted Harper's testimony that his fear of Valencia caused him to urinate in his pants.

Harper's credibility was further undermined by the numerous omissions and falsehoods in his statements to Detective Warkentin and the 911 operator. Further, the jury could have found Harper exhibited a consciousness of guilt through these omissions and falsehoods (CALCRIM No. 362) as well as through his flight from the market (CALCRIM No. 372). Additionally, any potential prejudice to Harper from being impeached by two convictions was minimized by the court's instruction to the jury that if they found a witness had been convicted of a felony they could "consider that fact *only in evaluating the credibility of the witness's testimony*[,]" that "[t]he fact of conviction does not necessarily destroy or impair a witness's credibility[,]" and that it was up to the jury to "decide the weight of that fact and whether that fact makes the witness less believable." (CALCRIM No. 316, italics added.) Moreover, the jury did not convict Harper of possession of methamphetamine even though the methamphetamine was found in his room, he admitted that he had sold drugs in the past (heroin), and he had over $2,000 in cash at his home. The jury also acquitted Harper of first degree murder. If the errors complained of had caused the jury to convict him simply because he had prior convictions, the jury would have convicted him of these offenses too. Their failure to do so provides further proof the errors were harmless beyond a reasonable doubt.[9]

---

[9] The jury deliberated approximately 9 hours and 20 minutes over three days: 20 minutes on May 6, 2014, 5 hours and 45 minutes on May 7, 2014, and 3 hours and 15 minutes on May 8, 2014. Harper cites *People v. Cardenas* (1982) 31 Cal.3d 897, 907 for the proposition that lengthy deliberations are evidence that a case was close. *Cardenas* is inapposite because there, the jury deliberated for 12 hours and the evidence against the defendant was not overwhelming. Here, the evidence of Harper's guilt was overwhelming, there was other evidence including the store surveillance video that completely undermined his claim of self-defense, and the jury's findings on the first

15.

## **DISPOSITION**

The judgment is affirmed.

---

degree murder and possession of methamphetamine charges demonstrate the admission of his prior convictions was not unduly prejudicial.