Filed 7/16/13  P. v. Willams CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054765 |
| v. | (Super.Ct.No. FSB903058) |
| EMMANUEL DONTEZE WILLIAMS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  J. David Mazurek, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Emmanuel Donteze Williams guilty of (1) nine counts of robbery (Pen. Code, § 211);[1] (2) one count of attempted robbery (§§ 664, 211); (3) one count of kidnapping for the purpose of committing robbery (§ 209, subd. (b)(1)); and (4) one count of assault with a deadly weapon (§ 245, subd. (a)(1)). For eight of the robbery counts, the attempted robbery count, and the kidnapping count, the jury found true the enhancement allegation that defendant used a firearm during the commission of the crimes pursuant to section 12022.53, subdivision (b). As to the assault count, the jury found true the enhancement allegation that defendant personally used a firearm during the commission of the offense pursuant to section 12022.5, subdivision (a). The trial court sentenced defendant to prison for a determinate term of 58 years, 2 months, and an indeterminate term of life with the possibility of parole.

Defendant raises four issues on appeal. First, defendant asserts the evidence supporting his assault conviction does not meet the substantial evidence standard. Second, defendant contends the evidence supporting his kidnapping conviction does not meet the substantial evidence standard. Third, defendant asserts the trial court erred by denying his motion to suppress evidence and traverse the search warrant. Fourth, defendant contends his trial attorney rendered ineffective assistance during the hearing on the motion to suppress evidence. We affirm the judgment.

---

[1] All further statutory references will be to the Penal Code unless otherwise indicated.

2

**FACTUAL AND PROCEDURAL HISTORY**

A.    SAN BERNARDINO ROBBERY

On July 21, 2009, at approximately 2:00 a.m., Gordon Goodale and Curtis Bodenbender were performing construction work on a McDonald's drive-thru window. The McDonald's was located near Highland Avenue and Del Rosa Drive in the City of San Bernardino. The drive-thru portion of the restaurant was open 24 hours, so Goodale barricaded the drive-thru to block traffic from coming through during the construction. The interior portion of the restaurant closed at 11:00 p.m. or midnight; therefore, there were no customers in the restaurant. However, three McDonald's employees were working in the restaurant. Goodale was performing construction work outside the restaurant, while Bodenbender was working inside the restaurant.

As Goodale was unloading boxes outside, two African-American men approached him holding guns. The taller of the two men was holding a revolver, while the shorter man (defendant) was holding an automatic gun with a silver slide. The taller man (defendant's accomplice) instructed Goodale "to get on the ground . . . face down." The accomplice placed the gun against Goodale's head and demanded Goodale's money, wallet, and telephone. Goodale gave the accomplice his wallet, but told him he did not have money or a telephone.

Bodenbender heard Goodale talking, so he looked outside the window. Bodenbender saw a man pointing a gun at Goodale, so he told the McDonald's manager to press the panic button. The restaurant manager pressed a panic button located in a cash register. Defendant climbed through the drive-thru window. When Bodenbender

3

turned around, defendant was pointing a gun at Bodenbender's face. Defendant commanded the manager to open the cash registers, which she did. Defendant then instructed the manager to open the safe. The manager opened the safe, while defendant raised his gun. After the safe was opened, defendant instructed Bodenbender and the manager to lie face down on the floor.

Defendant's accomplice instructed Goodale to stand up and open the restaurant door. Goodale ran to the restaurant door, but it was locked. The accomplice then instructed Goodale to go back to the drive-thru window and climb through it, which Goodale did. The accomplice then entered the restaurant by crawling through the drive-thru window. Goodale was taken to the kitchen area, where he laid face down. Goodale saw the safe was already opened, and defendant was taking money from a cash register. One of the men demanded Bodenbender's telephone and wallet, but Bodenbender explained they were in the construction truck.

A McDonald's employee, Maricela Camacho, was in the restroom when the robbery began. When Camacho exited the restroom, she walked toward the robbers. One of the robbers grabbed Camacho by her hair and threw her face down onto the ground. The man went through Camacho's pockets and took her wallet.

The restaurant manager was "a little hysterical." Defendant's accomplice yelled at the manager for looking at him. He said to the manager, "'What you lookin' at, bitch?'" The robbers' faces were covered with bandanas. Goodale told the manager to be quiet and stay on the ground. The robbers exited the restaurant via the drive-thru window. Goodale told everyone to stay on the floor to make sure the robbers were

4

gone. Three or four minutes later, police officers arrived. The robbers took approximately $1,400 from the McDonald's, as well as $50 worth of gift certificates, which came in $5 booklets. The gift certificates were kept in the safe.

Maria Moreno, a McDonald's employee, stored her purse in the restaurant office while she worked. Moreno was washing dishes when the robbery began, and she hid in the restaurant's walk-in freezer during the robbery. While in the freezer, Moreno pressed a panic button. Moreno exited the freezer after the robbery ended. Moreno saw her purse was open, and her wallet and telephone were missing. Moreno had approximately $400 in her wallet.

The shorter robber (defendant) was approximately five feet, seven inches tall, 145 pounds, and wore a black hoodie, dark pants, and dark shoes. The taller robber (the accomplice) was approximately five feet, ten inches tall, 170 pounds, and also wore a hoodie. The only portion of the robbers' faces that were exposed were their eyes and foreheads—the rest of their faces were covered by their bandanas.

B.     REDLANDS ROBBERY

Another McDonald's was located in the City of Redlands, on Redlands Boulevard at Alabama Street. On July 22, 2009, Martin Trujillo was working as the manager at the Redlands McDonald's. At approximately 1:30 a.m. on July 22, five construction workers were working on the restaurant performing renovation work. The interior portion of the restaurant was closed due to the construction, but the drive-thru remained opened. The construction workers were going in and out of the front door to fetch tools, so the front doors were unlocked. Trujillo was working in the restaurant's

5

office counting cash.  A second McDonald's employee, Reyna Cotero, was working in the dishwashing area.

Noel Mendoza, a construction worker, was working at the Redlands McDonald's at 1:30 a.m. on July 22 when three men entered, at least one of the three men was holding a gun.  The men were wearing black hooded sweatshirts and bandanas around their faces.  The only portion of the men's faces that were visible was the part above the nose.  One of the three men demanded Mendoza's money, wallet, and telephone.  The man then patted Mendoza down and took his wallet.

One of the robbers was African-American, 18 to 20 years old, approximately five feet, seven inches tall, with a thin build, and he was holding a semiautomatic gun with a silver slide.  The second robber also appeared to be 18 to 20 years old and approximately five feet, seven inches tall with a thin build.  The third robber was African-American, with a thin build, and appeared young.

The robbers told the construction workers, "'Get face down on the ground.'"  The construction workers laid on the ground.  One of the robbers took a telephone and cash from a construction worker, Mike Wickett.  The robbers also took the telephone, wallet, and cash from a third construction worker, John Chappell.  Chappell had approximately $75 cash in his pocket.

Mendoza identified defendant as one of the robbers.  Mendoza recognized defendant by his "cheekbone, upper [face] area" and "his skinny build."  Mendoza looked into defendant's eyes during the robbery and was approximately an arm's length

6

away from him. Mendoza believed defendant was the robber who was holding the semi-automatic gun with a silver slide.

Trujillo, who had been working in the office, heard someone say "'blood,'" and then the restaurant became quiet. Trujillo left the office to see what was happening. Trujillo saw the construction workers lying face down on the floor and three African-American men with bandanas on their faces. Defendant told Trujillo to open the safe, and threatened to shoot him if he did not comply. Defendant placed a gun against Trujillo's head while he opened the safe.

Cotero, who was in the dishwashing area, heard a person saying "bad words," so she moved to an area where she could hear exactly what was being said, because she thought the construction workers were arguing. Trujillo told Cotero to leave the restaurant, but there was no way for Cotero to exit. Cotero turned around and saw defendant wearing a black hoodie, with a bandana over his face, pointing a gun at Trujillo's head. Defendant moved towards Cotero, grabbed her by the back of her apron, and said, "'Where are you going?'" Defendant pulled Cotero into the office where the safe was located.

As defendant held the gun toward Trujillo's head, another man took money from the safe. The men also took money from the restaurant's cash drawers. Trujillo was unsure how much money was taken from the restaurant. The robbers exited the restaurant via the front door. One of the construction workers called the police. Trujillo and Mendoza went outside; the robbers were gone, but there was a "good amount" of money on the ground.

## C. INVESTIGATION

Redlands Police Detective Williams was assigned to the robbery at the Redlands McDonald's. Investigating Officer Cao informed Detective Williams that Wickett's GPS-equipped cellular telephone was taken during the robbery. The telephone company and Wickett gave Officer Cao permission to "ping" the telephone. Pinging a telephone refers to tracking the telephone via its GPS technology. At 2:49 a.m. the telephone was pinged. The pinged location of the telephone was Arden Avenue and 20th Street in the City of San Bernardino. The telephone was pinged again at 4:21 a.m. and was at the same Arden Avenue location.

Detective Williams spoke to Detective Hudson of the San Bernardino Police Department, who was investigating the July 21 robbery at the McDonald's in San Bernardino. Detective Williams viewed the surveillance photographs of the San Bernardino robbery, which were digital color photographs. Detective Williams decided to have Wickett's phone pinged again at 11:00 a.m. The telephone was still at the Arden Avenue location. Detective Williams had Wickett's telephone pinged once more at 1:00 p.m., and it was still at the Arden Avenue location. The GPS coordinates specifically referred to "Building B" of an apartment complex at 2011 Arden Avenue.

At 2:40 p.m. Detective Williams assembled a team of officers at the Arden Avenue apartment complex. Officers searched the exterior area of Building B, including the roof, for the telephone, but did not locate the phone. Detective Williams then tried contacting the building's residents. One of the residents Detective Williams spoke with was Lillian Jackson, in apartment B-209. A little after 3:00 p.m., while in

8

Jackson's apartment, Detective Williams saw defendant. Defendant was laying face down on a bed in the apartment. Defendant was wearing a belt similar to one worn by one of the robbery suspects—a black belt decorated with silver metal studs that created a checkerboard pattern; some of the metal studs were missing.

Detective Williams found a shoe "stuffed with a large amount of cash" next to the bed that defendant was laying on. There was also cash (1) under the mattress defendant was lying on, and (2) in the bed's box spring. In total, $1,424 in cash was found in the bedroom. Also under the mattress, Detective Williams found a telephone belonging to one of the Redlands McDonald's construction workers. The battery had been removed from the phone, but it was also under the mattress. The phone under the mattress was Wickett's phone, which police had been pinging.

In a kitchen drawer, police found a booklet of McDonald's gift certificates. There were also two cellular telephones in the kitchen drawer. In a closet, police found more cellular telephones. On the floor in a bedroom, police found another cellular telephone. The other telephones that were found (those not belonging to Wickett) lacked battery power, and therefore the police were unable to turn them on. In a cabinet, police found the wallet and government identification card belonging to Moreno, the San Bernardino McDonald's employee who hid in the freezer during the robbery.

On a television stand, police found multiple booklets of McDonald's gift certificates. Another gift certificate booklet was located on a computer stand. In total, approximately 40 gift certificate booklets were found in the apartment. The gift

9

certificate booklets were marked with serial numbers. Gift certificate booklets belonging to the San Bernardino McDonald's were within serial numbers NZ162401 and NZ169400. The booklets found in defendant's apartment fell within the foregoing serial numbers.

While Detective Williams was talking to Jackson, another male resident of the apartment, Q.F., arrived. Detective Williams believed Q.F. was 15 or 16 years old and approximately five feet, six inches tall. During the investigation, Detective Williams did not discover any evidence reflecting Q.F. resided in the bedroom where defendant, the cash, and Wickett's telephone were found. Jackson told Redlands Police Detective Zimmerman that when she went to sleep around midnight on the night of the Redlands robbery, Q.F. was at home but defendant was not home.

D. DEFENSE

We now present the defense evidence. Detective Hudson investigated the robbery at the San Bernardino McDonald's. As part of the investigation, Detective Hudson reviewed the restaurant's surveillance video. Detective Hudson saw the first person that came through the drive-thru window was wearing a blue hooded sweatshirt, jeans, a black belt with metal studs, and white tennis shoes. The second suspect who came through the drive-thru window was wearing a black hooded sweatshirt, jeans, and black tennis shoes with a white stripe.

Q.F.'s juvenile booking information reflected he weighed approximately 200 pounds and was five feet, eight inches tall. Q.F. was Jackson's son; defendant was Jackson's nephew. Jackson testified that Q.F. and defendant shared a bedroom with

10

Jackson's two daughters; however, Q.F. often slept in a living room chair. The apartment had a total of two bedrooms. On the night of the Redlands robbery, Jackson believed Q.F. was at home when she went to sleep around midnight or 1:00 a.m. Jackson recalled defendant going out the night of the Redlands robbery, but she was unsure of the exact timeframe.

On the day police arrived at Jackson's apartment, when she woke up she saw Q.F.'s friend, Lamar, sleeping on the living room floor. Lamar was 16 or 17 years old, approximately five feet, six inches tall, with a thin build. Jackson stated that in 2009, Q.F. was approximately five feet, five inches tall and 170 pounds, with a medium build—he did not weigh "anything close" to 200 pounds.

Some of the cellular telephones police took from Jackson's apartment belonged to Jackson. Jackson provided for her children by working and collecting county assistance. Jackson stated that in July 2009 she needed money to move out of the apartment, but she "didn't have enough. [She] didn't have nothing." Jackson had not seen the McDonald's gift certificate booklets in the house, and Q.F. did not ask for money to purchase the booklets. Defendant was 18 years old in July 2009, but he was unemployed.

**DISCUSSION**

A. <u>ASSAULT WITH A FIREARM</u>

Defendant contends the evidence supporting his conviction for assaulting Cotero with a deadly weapon (§ 245, subd. (a)(1)) does not satisfy the substantial evidence

11

standard. Specifically, defendant argues that his behavior perhaps amounts to brandishing a weapon, but does not rise to the level of assault. We disagree.

"'When reviewing a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation] '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' [Citation.]" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289-1290, fn. omitted.)

"Section 240 defines assault: 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.'" (*People v. Griggs* (1989) 216 Cal.App.3d 734, 739.) "Although temporal and spatial considerations are relevant to a defendant's 'present ability' under section 240, it is the ability to inflict injury on the present occasion that is determinative, not whether injury will necessarily be the instantaneous result of the defendant's conduct." (*People v. Chance* (2008) 44 Cal.4th 1164, 1171.)

At the beginning of the Redlands robbery, Cotero was in the dishwashing area. Cotero heard "bad words" being said so she moved to an area where she could hear if the construction workers were arguing. Trujillo told Cotero to leave the restaurant, but

12

there was no way for Cotero to exit. When Cotero turned around she saw defendant wearing a black hoodie, with a bandana over his face pointing a gun at Trujillo's head. Defendant moved towards Cotero, grabbed her by the back of her apron, and said, "'Where are you going?'" Defendant pulled Cotero into the office where the safe was located. Defendant told Cotero to stay in the office where he could see her. While the gun was pointed at Trujillo, defendant said, "'Open the safe. If you don't open it, I'm gonna shoot you.'" The gun was placed against Trujillo's head.

The implication created by the evidence is that if Cotero resisted defendant pulling her into the office, or if she tried to leave the office, then defendant would shoot her. In other words, defendant's acts of pulling Cotero by the back of her apron while holding a gun and threatening to kill Trujillo create the logical inference that Cotero was also under threat of imminent gun violence if she did not comply with defendant's demands. Thus, substantial evidence supports defendant's conviction for assault with a deadly weapon.

Defendant contends the assault conviction is not supported by the record because there is no evidence the gun was ever pointed at Cotero. "Pointing a gun at the ground and swinging it about the head while stating, '"'Don't come any closer; your life is in danger,'"' does not constitute the crime [of assault] at all. [Citation.] [¶] On the other hand, an illegal but conditional threat to shoot where the gun is pointed only at the ground may be sufficient. [Citation.]" (*People v. Heckathorne* (1988) 202 Cal.App.3d 458, 467.)

In this case, defendant made a conditional threat to shoot Trujillo in Cotero's presence, while the gun was placed against Trujillo's head. Defendant had pulled Cotero into the office with the second victim and told her to stay where he could see her. The implied threat in the foregoing situation is that Cotero would be shot if she left the office or did not comply with defendant pulling her into the office. Thus, even though the gun was pointed at Trujillo, as opposed to Cotero, we conclude defendant's conviction is supported by substantial evidence.

Defendant also appears to assert his conviction is not supported by the record because there is not substantial evidence the gun was loaded. "A long line of California decisions hold that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person. [Citations.]" (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3.) In determining whether a gun was loaded, a jury may rely on "a defendant's statements and behavior while making an armed threat against a victim." (*Id.* at p. 12.) For example, a defendant pointing a gun at a victim and saying, "'I have got you now,'" would support a finding the firearm was loaded because the words "would be meaningless unless the weapon were loaded." (*Id.* at p. 13.)

In this case, defendant held the gun against Trujillo's head while saying, "'Open the safe. If you don't open it, I'm gonna shoot you.'" Defendant's act of placing the gun against Trujillo's head while threatening to shoot supports a finding that the gun was loaded while Cotero was in the office with defendant and the gun. Placing the gun against Trujillo's head and threatening to shoot logically means the gun is loaded, thus a

14

reasonable inference can be made that defendant's gun was loaded. (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 13 ["[D]efendant's command to the victim to halt or 'I'll shoot' indicated the gun was then loaded"].) Accordingly, there is substantial evidence defendant's gun was loaded.

### B. KIDNAPPING

Defendant asserts the evidence supporting his kidnapping (§ 209, subd. (b)(1)) conviction does not meet the substantial evidence standard. Defendant argues the movement of Goodale was incidental to the commission of the San Bernardino robbery, and did not substantially increase the risk of harm beyond that inherent in the offense. We disagree.

The substantial evidence standard of review is set forth *ante*, so we do not repeat it here. In order to be found guilty of kidnapping to commit robbery, "the movement of the victim [must be] beyond that merely incidental to the commission of, and increase[] the risk of harm to the victim over and above that necessarily present in, the . . . underlying offense." (§ 209, subd. (b)(2).) "These two elements are not mutually exclusive but are interrelated. [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 870.)

As to the incidental movement issue, "the jury considers the 'scope and nature' of the movement, which includes the actual distance a victim is moved. [Citation.] There is, however, no minimum distance a defendant must move a victim to satisfy" this element. (*People v. Vines*, *supra*, 51 Cal.4th at p. 870.) For the second element (increased harm), the factors that must be considered are "'"the decreased likelihood of

15

detection, the danger inherent in a victim's foreseeable attempts to escape, and the attacker's enhanced opportunity to commit additional crimes. [Citations.] The fact that these dangers do not in fact materialize does not, of course, mean that the risk of harm was not increased."' [Citations.]" (*Ibid.*)

Outside the San Bernardino McDonald's, defendant's accomplice instructed Goodale "to get on the ground . . . face down." The accomplice placed the gun against Goodale's head and demanded Goodale's money, wallet, and telephone. Goodale gave the man his wallet.

After the accomplice took Goodale's wallet, he instructed Goodale to stand up and open the restaurant door. Goodale ran to the restaurant door, but it was locked. The accomplice then instructed Goodale to go back to the drive-thru window and climb through it, which Goodale did. The accomplice then entered the restaurant by crawling through the drive-thru window. Goodale was taken to the kitchen area, where he laid face down. Goodale saw the safe was already opened, and defendant was taking money from a cash register.

In the area around the San Bernardino McDonald's there was a pizza restaurant, a bowling alley, a bank, and a Jack in the Box restaurant. The Jack in the Box was open 24 hours, and it was located across the street from the McDonald's. Goodale was moved after defendant's accomplice stole his wallet and after defendant was already inside the restaurant. By moving Goodale inside, defendant and his accomplice decreased the likelihood of detection because people across the street at the Jack in the Box would be less likely to see Goodale's distress and need for help. Additionally,

16

moving Goodale inside the restaurant enhanced defendant's opportunity to commit additional violent crimes against Goodale, should Goodale attempt to escape or resist. If Goodale remained outside, he would have had a better chance to escape violence than being inside a restaurant where the only means of escape appeared to be through a window. Accordingly, the second prong is supported by substantial evidence.

The movement of Goodale was not merely incidental to the robbery because Goodale was moved after his wallet was taken and after defendant was already inside the restaurant with the safe open. Thus, a majority of the robbery was accomplished prior to Goodale being moved inside. Therefore, it appears Goodale was moved inside for the purposes of controlling him and exposing him to greater risk while the robbery was completed. Accordingly, we conclude the first prong is also supported by substantial evidence.

Defendant contends the first prong is not met because Goodale was moved into the restaurant for the purpose of facilitating the robbery—he was only moved in order to successfully complete the robbery. We do not find this argument to be persuasive because Goodale was moved after his wallet was taken and after the restaurant safe was opened. Defendant's accomplice had a gun to Goodale's head; he could have stayed outside with Goodale on the ground. Instead, the accomplice required Goodale to climb through the restaurant window—into a space with little chance for escape, which created a greater ability to control Goodale by threat of violence. Thus, we find defendant's argument to be unpersuasive.

Defendant asserts moving Goodale was necessary to accomplish the robbery because the number of victims was greater than the number of robbers, so the robbers needed all the victims in one place in order to successfully complete the robbery. Again, we find this argument to be unpersuasive because the safe was open and Goodale's wallet had been taken *prior* to Goodale being moved. Thus, it does not appear moving Goodale was necessary for the sake of a successful robbery, as most of the robbery was completed prior to moving Goodale.

Next, defendant argues that moving Goodale did not substantially increase the risk of harm to Goodale beyond that inherent in the robbery. Defendant reasons Goodale was moved from an area where he was alone to an area with other victims and panic buttons, and therefore the increase in danger was not substantial. We disagree with defendant's argument because the movement placed Goodale in an enclosed space where non-victim witnesses were less likely to see his distress, where it was more difficult to escape, and where there was greater opportunity for defendant and/or his accomplice to commit a violent act without detection by a passersby.

C.    SEARCH WARRANT

1.    *PROCEDURAL HISTORY*

a)    Defendant's Motion

On April 27, 2011, defendant filed a motion to quash the search warrant and "suppressing as evidence all items taken" from Jackson's apartment. Defendant asserted the initial entry and search of the residence were unlawful and therefore the search warrant affidavit contained information from an illegal search, which caused any

18

evidence obtained in the apartment to be "'fruit of the poison[ous] tree.'" Defendant asserted (1) police officers initially entered Jackson's apartment without consent, and (2) there were no exigent circumstances requiring a protective sweep of the apartment.

### b) The Prosecution's Opposition

The prosecution made the following argument in opposition to the motion: "[A]ssuming that the items located under the mattress [were] illegally found upon the initial consent entry, the locating of the cell phone that was pinged does support the affiant's declaration that the victim's cell phone was pinged to that location. Therefore, the other statements made by the affiant should be seen as truthful and credible." The prosecution asserted there was probable cause for the search warrant independent of a possibly illegal initial search. Specifically, the fact that Wickett's cell phone was pinged to the general location of Jackson's apartment created an independent source of probable cause that would have supported a search warrant.

### c) The Prosecution's Evidence

On August 8, 2011, the trial court held a hearing on defendant's motion to quash. Detective Williams testified at the hearing. Detective Williams described pinging Wickett's telephone. The GPS coordinates indicated the telephone was in Building B of 2011 Arden Avenue, on the north side of the building. There were four apartments on the north side of the building. Detective Williams knocked on all the doors including Jackson's door; no one answered the doors at the other three apartments. An audio recorder recorded the conversation between Detective Williams and Jackson. The audio recording of the conversation was played at the hearing.

19

The transcript reflects the following:  Jackson opened the door and greeted Detective Williams.  Detective Williams introduced himself and asked if anyone in the house was on parole or probation.  Jackson responded that defendant and Q.F. were on probation.  Detective Williams then asked, "Can I talk to you for a minute?"  At which point it appeared Detective Williams stepped inside the apartment as Jackson said, "[Y]ou kind of have to excuse the house because we are in the process of moving out."  As the conversation progressed it appeared Detective Williams was moving through the apartment because he began talking to a male, presumably defendant, because Q.F. was said to be outside.  Detective Williams asked defendant if he was on felony probation and defendant responded, "Yes."

Jackson asked why the police were at the house and "what's goin[g] on."  Jackson asked, "Can you all tell me what's going on?"  Jackson did not receive an answer and then said, "I wanna know what's goin[g] on, because my house [is] being searched and I don't know what the fuck is going on."  Detective Williams asked defendant who his probation officer was and whether he had search terms as part of his probation.  Defendant responded that he had search terms as part of his probation and that he resided in Jackson's house.

Jackson then said, "Call my sister.  Tell her [to] get the hell over here.  I don't know what the hell is goin[g] on.  Somebody needs to tell me some[thing], she need[s] to come now."  Detective Williams noticed defendant wearing a belt that matched a metal-type belt worn by one of the robbery suspects.  It appeared an officer looked under defendant's bed, because Detective Williams said, "This is where GPS to [*sic*].

Found this attached under the bed.  We got batteries."  Detective Williams told Jackson he was conducting a theft investigation, and said he wanted her to wait in a different room while he investigated.  Jackson responded, "I hope you all don't mistake [*sic*] and take none of my shit, okay?"

Detective Williams then began speaking to another male, presumably Q.F. Detective Williams asked if Q.F. was on parole or probation.  Q.F. responded that he was on misdemeanor probation, but he was unsure whether search terms were part of his probation.  An officer in the background said, "He has a cell phone."  Detective Williams questioned whether any of the cell phones found in the apartment were Wickett's phone.

Detective Williams called Detective Hale of the San Bernardino Police Department.  Detective Williams told Detective Hale he found a male wearing a silver belt at the address where Wickett's telephone was pinging.  Detective Williams also told Detective Hale, "And I have a bunch of wads [of] cash from under the bed."  Detective Williams told Detective Hale he was "freezing" the apartment.  Detective Williams instructed other officers not to go into the apartment.

When questioned by another officer who seemingly wanted to search the apartment, Detective Williams reminded the officer that they did not know for sure whether defendant or Q.F. was on probation because officers had not yet confirmed the information with juvenile hall.  Detective Williams and the other officer discussed whether the better option would be (1) confirming Q.F.'s and defendant's probation

21

status with juvenile hall, or (2) obtaining a search warrant. Detective Williams decided to get a search warrant.[2]

In testifying at the hearing, Detective Williams stated that when he asked to speak with Jackson she agreed and stepped back, gesturing for him to enter the apartment. At that point Detective Williams entered. Jackson began moving toward the back of the apartment. Detective Williams became concerned for his safety, because (1) firearms were used in the two robberies, (2) Jackson stated two males lived in the apartment whom Detective Williams had not yet seen; and (3) Jackson stated the two males were on the patio, when it appeared no one was on the patio, thus leading Detective Williams to believe people were hiding in the apartment. Detective Williams and Detective Zimmerman followed Jackson as she moved toward the back of the apartment. When walking through the apartment, Detective Zimmerman saw defendant and motioned to Detective Williams to look in defendant's bedroom. Detective Williams began speaking to defendant. After defendant stood up and began speaking to Detective Williams, Detective Zimmerman moved defendant's mattress.

Detective Zimmerman told Detective Williams he "flipped up" defendant's mattress and found "wads of cash and a cellular telephone." Detective Williams explained Detective Zimmerman was "clearing" the bedroom by looking under furniture

---

[2] The record reflects the trial court stopped listening to the audio recording at the point where "the residence is being frozen." Since the playback of the audio recording was not transcribed during the hearing, i.e., the court reporter did not transcribe it, it is unclear from the record exactly when the trial court and/or prosecutor stopped the recording.

22

or places where individuals could hide. Detective Williams then "froze" the apartment while he applied for a search warrant.

### d) Defendant's Evidence

Jackson also testified at the hearing. Jackson testified she invited Detective Williams into her home to speak with her. Once inside, Detective Williams asked Jackson to sit down. Detective Williams or Detective Zimmerman walked to the back of the apartment and found defendant, while Jackson was seated in a chair "by the back door."

### e) The Probable Cause Statement

The statement of probable cause attached to Detective Williams's search warrant application described the robberies at the two restaurants, and the property that was taken. It also described pinging Wickett's cellular telephone and the GPS coordinates pointing to 2011 Arden Avenue, Building B. Detective Williams described Jackson inviting him into her apartment to speak with her. Detective Williams explained that he and Detective Zimmerman conducted a protective sweep of the apartment to locate any other people in the apartment, due to firearms being involved in the robbery.

Detective Williams saw defendant lying in a bedroom; the bedroom door was "wide-open." Detective Williams saw defendant was wearing "a checkered-white diamond pattern belt," which matched the belt worn by a suspect during the two robberies. Detective Williams set forth that both defendant and Q.F. admitted being on probation. Detective Williams described looking under defendant's mattress and finding large bundles of cash and a cellular telephone battery, which matched the brand

23

of Wickett's cellular telephone. Detective Williams opined that searching Jackson's apartment would lead to more evidence related to the two restaurant robberies.

### f) Trial Court's Ruling

The trial court denied the motion to suppress. The trial court concluded, "Detective Williams had consent to, number one, talk to Ms. Jackson, and, number two, to enter the apartment to talk to her." The trial court further noted Jackson did not ask Detective Williams to leave the apartment. Additionally the trial court found it was reasonable for the detectives to conduct a protective sweep of the apartment given that (1) Wickett's cellular phone was pinged to the general location of Jackson's apartment, (2) defendant matched the description of a suspect involved in the robberies, (3) defendant was wearing a distinctive belt that matched a belt worn during the two robberies, (4) there were firearms used during the robberies, and (5) there were people unaccounted for who lived in the apartment, e.g., Q.F.

### 2. *ANALYSIS*

### a) Contentions

Defendant raises a combination of arguments under a single heading. (Cal. Rules of Court, rule 8.204(a)(1)(B) [separate headings].) First, defendant asserts his trial counsel was ineffective for (1) not arguing that the protective sweep was illegal, (2) failing to argue the probable cause statement contained deliberate lies or that Detective Williams had a reckless disregard for the truth, and (3) not obtaining a ruling from the trial court on the issue of whether the search warrant was valid.

24

Second, defendant contends the trial court erred by denying his motion to suppress evidence because (1) Jackson did not consent to the detective searching her apartment, (2) a protective sweep of the apartment was not justified and was an illegal search, and (3) the affidavit in support of the warrant application contained lies.

### b) Denial of the Motion

We begin our analysis with defendant's contention that the trial court erred by denying the suppression motion because (1) there was a lack of consent, (2) a protective sweep was not justified, and (3) the affidavit contained lies. We disagree with defendant's contention.

"In reviewing the trial court's denial of a motion to suppress evidence, we view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence. [Citations.] We independently review the trial court's application of the law to the facts. [Citation.] [¶] The threshold issue before us is, '"whether the challenged action by the officer 'has infringed an interest of the defendant which the Fourth Amendment was designed to protect.' [Citation.] . . ." [Citations.]' [Citation.]" (*People v. Nishi* (2012) 207 Cal.App.4th 954, 960.)

Jackson invited the detectives into her apartment, which waived defendant's right to privacy in items the officers observed in plain view. (*People v. Superior Court* (2012) 204 Cal.App.4th 1004, 1015.) When Detective Williams and Detective Zimmerman entered the apartment, they were engaged in conversation with Jackson. Jackson then began moving away from the officers and going "[t]oward the back of the

25

apartment in the patio area." Detective Williams and Detective Zimmerman "follow[ed] Ms. Jackson to speak with her." As the three walked, they "continue[d] the conversation." "[S]hortly after that . . . Detective Zimmerman saw the defendant[.]" Defendant was "[l]ying face down on a bed" in a bedroom. The bedroom "door was wide-open." "Detective Zimmerman motioned to [Detective Williams] with his hand and his head to go look in the bedroom."

Detective Williams saw defendant and spoke to him. Detective Williams asked defendant to "step off the bed and come toward" the detective. Defendant was wearing a silver belt matching the belt worn during the robberies. Detective Williams spoke to defendant in the living room. It can be inferred from this evidence that defendant was wearing the belt in plain sight, and therefore, there was no Fourth Amendment violation in the detectives seeing the belt. This inference is further supported by a comment Detective Williams made after "freezing" the apartment. When speaking to another detective, Detective Williams said, "I think I have, you know that picture that you guys had keep [*sic*] wearing that chrome belt? Think he was wearing a silver belt. I think I have that kid in here with that belt." This comment supports an inference that the belt was visible.

Law enforcement officers may perform a protective sweep "'in conjunction with an in-home arrest [or detention] when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.' [Citation.] 'A "protective sweep" is a quick and limited search of [the] premises, incident to an arrest [or detention] and

26

conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.' [Citation.]" (*People v. Werner* (2012) 207 Cal.App.4th 1195, 1205.) Law enforcement officers must have a reasonable suspicion that the area to be swept harbors a dangerous person. (*Ibid.*) The totality of the circumstances must be analyzed to determine if the officer had a reasonable basis for his suspicion. (*Id.* at p. 1206.)

Upon seeing defendant, Detective Williams asked if defendant was on felony probation and defendant responded, "Yes." It can be inferred that at that point, defendant was at least temporarily detained. As Detective Williams spoke to defendant in the living room, Detective Zimmerman performed a protective sweep. The protective sweep was needed because Q.F. still had not been located and firearms had been used in the crimes. Jackson said Q.F. was on the patio, but the detectives did not see anyone on the patio, which would cause a reasonable person to presume Q.F. was hiding in the apartment and possibly armed. Given this situation, the record supports a finding that the detectives had a reasonable suspicion that the apartment harbored a dangerous person.

While performing the protective sweep, Detective Zimmerman looked under defendant's bed and found cash and a cell phone battery. As Detective Zimmerman conducted the protective sweep, Q.F. was located outside the apartment by a third officer. The protective sweep ended and Detective Williams spoke to Q.F.

Given that Jackson invited the detectives into her home, and that they were following her through the apartment when they saw defendant and his belt in plain

27

sight, it appears a warrant was not needed for the discovery of defendant's belt because it was in plain sight. Further, a warrant was not needed for the discovery of the items under the bed, because those objects were found via a justified protective sweep. As a result, the trial court did not err by denying defendant's motion to suppress.

Defendant contends the trial court erred by denying the motion because the protective sweep of the apartment was not justified in that "no one was arrested or detained before the entry into the home." In this case, Jackson invited the detectives into the home, and the protective sweep did not begin until after the detectives saw defendant wearing the distinctive belt in plain sight, questioned him about his probation status, and detained him. Accordingly, since the protective sweep did not begin immediately upon the detectives entering the home, defendant's argument is not persuasive.

Next, we address defendant's contention that the trial court erred by denying his motion because the warrant affidavit contained lies. Defendant contends the affidavit contains a lie because Detective Williams wrote that Wickett's cellular telephone was pinged to "the address of '2011 Arden Avenue' in the City of San Bernardino, and pinpointed the location to be 2011 Arden Avenue, on the north-west corner of building 'B.'" Defendant asserts this statement was a lie because it gives the appearance that Wickett's telephone was pinged directly to Jackson's apartment, when, in reality, there were four different apartments where the telephone could have been located.

Defendant's argument is not persuasive because in the warrant application, Detective Williams requested permission to search "2011 Arden Ave., building 'B',

apartment #209." The apartment was described as being located on the second story of the building. Since the apartment was on the second floor, and was numbered 209, it can reasonably be inferred that there are other apartments located in "Building B." Therefore, it does not appear that Detective Williams lied about the telephone being pinged directly to Jackson's apartment, because it is clear from Detective Williams statement that the telephone was pinged only to a particular section of an apartment building—not to a specific apartment.[3]

c)        Ineffective Assistance of Counsel

We now address defendant's ineffective assistance of counsel contention. As set forth *ante*, defendant asserts his trial counsel was ineffective for (1) not arguing that the protective sweep was illegal, (2) failing to argue the probable cause statement contained deliberate lies or that Detective Williams had a reckless disregard for the truth, and

---

[3] During oral argument, defendant faulted this court for employing different reasoning in resolving the suppression issue than that raised at the trial court. We agree with defendant that we have employed different reasoning; however, this was necessary because defendant's argument on appeal does not parallel the argument he developed at the trial court. Since defendant has raised a different argument, different reasoning is required to respond to his appellate contention. At the trial court, defendant asserted the evidence should be suppressed because (1) Jackson did not give the officers consent to enter her apartment, and (2) it was unreasonable for an officer to believe a person could have been hiding under defendant's bed, so "the search underneath the mattress exceeded the scope of a protective sweep." There is a sentence in one of defendant's trial court suppression motions that reads, "There was no exigency present to allow for a 'protective swe[e]p' particularly a search under a mattress"; however, that is the extent of the argument. Thus, on appeal, when defendant's primary argument has shifted to focus on the circumstances justifying the protective sweep, this court's analysis will necessarily differ from the analysis offered below.

(3) not obtaining a ruling from the trial court on the issue of whether the search warrant was valid.

"The test for determining whether a criminal defendant received ineffective assistance of counsel is well-settled. The court must first determine whether counsel's representation 'fell below an objective standard of reasonableness.' [Citation.] The court then inquires whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jones* (2010) 186 Cal.App.4th 216, 234-235.)

Defendant asserts his trial counsel erred by not arguing that the protective sweep was illegal. As explained *ante*, the protective sweep was legally justified under the circumstances of this case. As a result, trial counsel did not err by not arguing that the sweep was illegal, because the sweep was legal.

Next, defendant asserts his trial counsel was ineffective because he did not argue the probable cause statement contained deliberate lies or that Detective Williams had a reckless disregard for the truth. As set forth *ante*, it does not appear that the affidavit contains lies. Thus, trial counsel acted reasonably by not arguing that the affidavit contained a lie.

Third, defendant contends his trial counsel was ineffective for not obtaining a ruling from the trial court on the motion to quash the search warrant. As explained *ante*, defendant has not presented a valid error in the search warrant. Thus, to the extent trial

counsel erred by not reminding the court to issue an explicit ruling on the motion to quash, there is nothing indicating the result of the proceeding would have been different if counsel had reminded the trial court, because an error in the warrant has not been shown.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER _____
                                                                              J.


We concur:


McKINSTER _____
                    Acting P. J.


CODRINGTON _____
                                    J.


31